ROBBINS GELLER RUDMAN
   & DOWD LLP
ERIC I. NIEHAUS (239023)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
ericn@rgrdlaw.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ALISTER WATT and JAMES SUPPLES, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>    vs.<br><br>OKCOIN USA INC., OKC HOLDINGS CORPORATION, and AUX CAYES FINTECH CO. LTD.,<br><br>                    Defendants. | Case No. 4:25-cv-00368-JSW<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT<br><br><br><u>DEMAND FOR JURY TRIAL</u> |

AMENDED COMPLAINT – Case No. 4:25-cv-00368-JSW

Plaintiffs Alister Watt and James Supples, individually and on behalf of all others similarly situated ("Plaintiffs"), by and through their undersigned attorneys, bring this action against defendants OKCoin USA Inc. ("OKX US"), OKC Holdings Corporation and all predecessor organizations and entities ("OKX Group"), and Aux Cayes FinTech Co. Ltd. ("Aux Cayes") (collectively, "OKX" or "Defendants").  Plaintiffs allege the following based upon their own knowledge, or where there is no personal knowledge, upon the investigation of counsel and/or upon information and belief.

## NATURE OF THE ACTION

1.    Defendant OKX Group, founded by Mingxing Xu aka Star Xu ("Star Xu") in 2015 is the parent organization of a group of legal entities which operate one of the largest cryptocurrency platforms in the world, where customers deposit, trade, and withdraw, hundreds of types of digital assets, including cryptocurrencies and tokens (collectively, "cryptocurrency" aka "crypto"), such as Bitcoin ("BTC"), Ethereum ("ETH") and others.  OKX Group and its composite entities operate cryptocurrency exchanges accessible at several websites, including OKCoin.com and OKX.com, as well as through smartphone apps and other services (collectively, the "OKX Platform" or "OKX").

2.    Star Xu and other senior officers of OKX, including Hong Fang and Jay Hao (the "OKX Officers"), managed and directed OKX's day-to-day affairs.  The OKX Platform has earned billions of dollars since its launch; and its growth was fueled in large part by OKX targeting the large and lucrative U.S. crypto market.  OKX's meteoric rise was achieved through willfully violating numerous U.S. laws and regulations which were established to protect consumers, investors, and American national security, which (if followed) would have limited OKX's access to the U.S. market and slowed its growth.

3.    Specifically, Defendants knowingly failed to register its primary exchange at OKX.com (formerly OkEx.com) as a money transmitting business ("MTB"), willfully violated the Bank Secrecy Act ("BSA") by failing to implement and maintain an effective anti-money laundering

("AML") program, and disregarded crucial Know Your Customer ("KYC") rules – all in a deliberate and calculated effort to profit from the U.S. market, without implementing controls required by U.S. law.

4.      Defendants' willful disregard of these important laws and regulations turned the OKX Platform into a magnet and hub for criminals, users from sanctioned jurisdictions, terrorists, and other bad actors – becoming a critical part of their efforts to launder crypto which was stolen or obtained by other unlawful means.  OKX became a preferred-choice as the "get-away driver" for a large number of bad actors to launder stolen cryptocurrency and render it untraceable so they could evade detection and profit from their criminal activity.  During the Class Period, OKX served as the vehicle for laundering billions of dollars of proceeds from suspicious and criminal activities.

5.      Under normal circumstances, a core attribute of cryptocurrency transactions is that there is a permanent record of those transactions on the public blockchain; and the chain-of-title of cryptocurrency is permanently and accurately traceable on the blockchain, which acts as a "ledger." After a bad actor steals someone else's crypto, the location of the stolen cryptocurrency is publicly available on the blockchain.  As a result, there is a substantial risk the authorities would track down that bad actor by retracing his steps on the blockchain, and he would need to constantly look over his proverbial shoulder.  Had OKX complied with U.S. law, it could have assisted in the freezing, tracking and potential recovery of stolen assets.  Defendants' refusal to implement important KYC and AML policies and procedures, however – in flagrant violation of U.S. laws and regulations – facilitated the laundering of stolen cryptocurrency and prevented the recovery of the stolen assets.

6.      OKX US, one of OKX Group's entities, is based in the United States, obtained licenses in approximately 47 states to offer cryptocurrency services, and operates OKCoin.com.  The OKCoin.com exchange – operated by OKX US – offers far fewer tokens to customers and has substantially less liquidity than OKX.com.  As a result, OKX sought U.S.-based customers for the

OKX.com exchange to maximize the Company's growth and transaction volumes even though OKX.com was not licensed in the United States, was not legally permitted to service U.S.-based customers, and did not have adequate protections in place to prevent the laundering of stolen cryptocurrency. In reality, OKCoin.com, which was operated by OKX US but controlled by OKX Group, served as a smokescreen and distraction to regulators so OKX.com could continue servicing U.S.-based customers in violation of the law.

7. OKX.com acted as a depository for millions of dollars of cryptocurrency stolen from individuals and entities located in the United States, including Plaintiffs and members of the Class. Defendants acted together, along with the OKX Officers, in furtherance of a scheme to generate transactions and increase market share for OKX.com from all sources, including U.S.-based users, sanctioned users, criminals, crypto-thieves, and accounts and cryptocurrency wallets previously identified as being connected to illegal conduct. Defendants and the OKX Officers operated the OKX Crypto-Wash Enterprise (defined below), which enabled bad actors to transfer assets obtained from criminal activity targeting victims located in the United States, including California, to OKX.com, exchange those assets for different assets on OKX.com's exchange, and then transfer those newly "cleaned" assets out of OKX.com so the assets were no longer associated with the original assets or traceable on the ledger. Throughout the Class Period, the OKX Crypto-Wash Enterprise became a leading conduit of cryptocurrency stolen from U.S. citizens, residents, and entities; thereafter enabling bad actors to seamlessly transfer stolen crypto around the United States and the world.

8. As a result of the wrongful conduct of the OKX Crypto-Wash Enterprise as alleged herein, cryptocurrency theft victims in the United States lost the ability to track and potentially recover their stolen cryptocurrency assets.

9.     Eventually, the authorities caught up with Defendants.  On February 24, 2025, Defendant Aux Cayes, an operator of OKX.com, pled guilty to criminal charges and regulatory violations brought by the United States Department of Justice (the "DOJ").[1]  In connection with its guilty plea arising out of the scheme alleged herein, Defendant Aux Cayes paid ***more than $500 million in penalties*** and agreed to the Statement of Facts attached to the plea agreement (the "DOJ SOF").

10.    Plaintiffs bring claims on behalf of themselves and all persons or entities in the United States whose cryptocurrency was removed from a non-OKX digital wallet, account, or protocol as a result of a hack, ransomware, or theft and, between January 10, 2021 and the date of Judgment (the "Class Period"), transferred to an OKX account, and who have not recovered all of their cryptocurrency that was transferred to OKX (the "Class").

11.    Plaintiffs allege claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962(c)-(d); conversion; and aiding and abetting conversion.

12.    In asserting the claims herein, Plaintiffs are not relying on any contracts or agreements entered into between OKX and any users of OKX to assert any claims alleged herein; and none of Plaintiffs' claims derive from the underlying terms of any such contracts or agreements. Plaintiffs are not relying on any actions Defendants have taken or could have taken, or benefits Defendants have received or could have received, pursuant to the terms of any contracts or agreements with users of OKX.

13.    Plaintiffs' claims are based on OKX violating federal statutory obligations and engaging in the conversion of, and aiding and abetting the conversion of, cryptocurrency properly belonging to Plaintiffs and the members of the Class.  Specifically, Defendants, *inter alia*:

---

[1]    *See United States v. Aux Cayes FinTech Co. Ltd.*, No. 1:25-cr-00069 (S.D.N.Y.).

(i) committed, and aided and abetted, acts constituting indictable offenses under 18 U.S.C. §1960 (relating to illegal money transmitters) and 18 U.S.C. §1961(1)(E) (act indictable under the Currency and Foreign Transactions Reporting Act aka the Bank Secrecy Act (BSA); and (ii) aided and abetted acts constituting indictable offenses under 18 U.S.C. §1956 (laundering of monetary instruments), 18 U.S.C. §1957 (engaging in monetary transactions in property derived from specified unlawful activity), and 18 U.S.C. §2314 (relating to interstate transportation of stolen property).

14.    Plaintiffs seek damages and equitable relief on behalf of themselves and the Class, including, but not limited to: treble their monetary damages; injunctive relief; damages; costs and expenses, including attorneys' and expert fees; interest; and any additional relief that this Court determines to be necessary or appropriate to provide complete relief to Plaintiffs and the Class.

## JURISDICTION AND VENUE

15.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because Plaintiffs' claims arise under the RICO Act, 18 U.S.C. §1962. The RICO Act provides for nationwide service of process, and Defendants conduct a substantial portion of their business in the United States. This Court has general jurisdiction over OKX US, there is no other district in which a court will have personal jurisdiction over the alleged co-conspirators, and Defendants have engaged in a single nationwide RICO conspiracy. This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §1965(b) and (d).

16.    The Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332(d), because the members of the putative class are of diverse citizenship from Defendants, there are more than 100 members of the putative class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of costs and interest.

17.    The Court has personal jurisdiction over OKX Group and Aux Cayes because OKX.com utilized a cloud computing platform and applications programming interface ("API")

service owned by a technology service provider with an Internet Protocol ("IP") location based in San Francisco, California that hosted the www.okx.com website, stored OKX's data, and operated OKX.com's exchange platform or servers. OKX.com's exchange platform was where the stolen cryptocurrency was laundered and where the traceability of the cryptocurrency belonging to Plaintiffs and the members of the Class was eliminated. Upon information and belief, Plaintiffs and the members of the Class were harmed in this District. The Court also has personal jurisdiction over OKX Group and Aux Cayes because, upon information and belief, OKX.com actively serviced customers based in this District through the OKX.com website. Furthermore, this Court has jurisdiction over OKX Group because: (i) it exercised complete control over OKX US, which maintains executive offices in San Francisco, California; (ii) it operates the OKCoin.com website through its member entity OKX US; and (iii) it utilized its control over OKX US to engage in the wrongdoing alleged herein during the Class Period.

18. In addition, the Court has specific personal jurisdiction over Defendants because they: (i) transacted business in California; (ii) have substantial aggregate contacts with California; (iii) engaged in and are engaging in conduct that has and had a direct, substantial, and reasonably foreseeable and intended effect of causing injury to persons in California; and (iv) purposely availed themselves of the laws of California. This Court also has specific personal jurisdiction over OKX Group for the additional reason that it asserted substantial control over OKX US, as described below.

19. Exercising jurisdiction over Defendants in this forum is reasonable and comports with fair play and substantial justice.

20. Venue is proper in this District pursuant to 28 U.S.C. §1391 because OKX US is subject to the Court's personal jurisdiction in this District, and OKX Group and Aux Cayes as foreign entities, may be sued in any judicial district. *See* 28 U.S.C. §1391(c)(3).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PARTIES**

**Plaintiffs**

21.     Plaintiff Alister Watt is a citizen of the U.S. who resides in Charlotte, North Carolina. In 2023, while he resided in the U.S., a third party targeted his cryptocurrency assets located in the United States and stole more than Seven Hundred Twenty-Five Thousand Dollars ($725,000.00 USD) worth of cryptocurrency (23.212 Bitcoin and 26.7 Ethereum) from him.  After extensive investigation, it was determined that a material portion of the cryptocurrency stolen from Plaintiff Watt was sent to at least one account at OKX.com.  At no time has Plaintiff Watt ever held an account with OKX.com or OKCoin.com, nor has Plaintiff Watt ever agreed to any terms of use that OKX.com or OKCoin.com impose upon their accountholders.

22.     Plaintiff James Supples is a citizen of the U.S. who resides in San Juan, Puerto Rico. On or about December 19, 2024, while he resided in the U.S., a third party targeted his cryptocurrency assets located in the United States and stole from him USDT (Tether), Eth, Solana, Bitcoin and other cryptocurrency assets worth more than $1.34 million.  After extensive investigation, it was determined that a material portion of the cryptocurrency stolen from Plaintiff Supples was sent to at least one account at OKX.com on or about December 20, 2024.  At no time has Plaintiff Supples ever held an account with OKX.com or OKCoin.com, nor has Plaintiff Supples ever agreed to any terms of use that OKX.com or OKCoin.com impose upon their accountholders.

23.     Each of the Plaintiffs referenced in ¶¶21-22 above reside in the United States (or its territories) and had their cryptocurrency stolen from them in the United States.

24.     Upon information and belief, OKX failed to apply KYC and AML procedures as required by statutory law to detect the lawful ownership of the cryptocurrency properly belonging to Plaintiffs or the members of the Class.

**Defendants**

25.     Defendant OKX Group and all predecessor organizations and entities is the parent organization of different legal entities around the world which operate the OKX cryptocurrency exchanges.  At times relevant herein, the entities controlled by OKX Group include, without limitation, Defendants OKCoin USA Inc., Aux Cayes FinTech Co. Ltd., and many others.  OKX Group, through its subsidiaries, operates and controls the cryptocurrency exchanges located at www.okx.com ("OKX.com") (formerly located at www.okex.com) and www.okcoin.com ("OKCoin.com"), and operates and controls smartphone apps connecting users to its exchanges and services.  In January 2022, OKEx rebranded to OKX.  Star Xu (described below), who is a foreign national and named as a key non-defendant herein, owned at least 74.3% of OKX Group through affiliated entities and exercised full and absolute control over each of the OKX Group entities.  Star Xu created, controlled, and directly managed the day-to-day affairs of OKX Group and each of the web of companies which comprised OKX Group.

26.     Defendant Aux Cayes is a Seychelles registered company and offers the OKX Platform for users outside the United States, including users not expressly covered by another one of the OKX Group legal entities.  Aux Cayes formerly conducted business under the name "OKEx," and has conducted business under the name "OKX" since approximately January 2022.  Aux Cayes has employees and offices located in Singapore, China, the United States, and other places around the world.  Aux Cayes has never registered as a money services business with FinCEN.  Aux Cayes was 100% owned of by OKX Group and controlled by Star Xu at times relevant herein.  Aux Cayes is one of many OKX Group entities which provide users access to the OKX.com exchange.

27.     Defendant OKX US is a Delaware corporation with a principal place of business in San Francisco, California.  Defendant OKX US is a subsidiary of OKX Group and during most of the Class Period operated the OKCoin.com exchange in the United States and serviced customers

based in the United States.  OKX US is a licensed money transmitter in approximately 47 states.

OKX US is one of the OKX Group web of entities and was 100% owned by OKX Group and

controlled by Star Xu at times relevant herein.  For much of the Class Period, OKX US assisted in

enabling OKX.com to service U.S.-based customers.  OKX US's operation of the OKCoin.com

exchange in the United States made it appear as if OKX Group was attempting to comply with U.S.

laws and regulations through the OKCoin.com website.  In reality, OKX US was an important part

of the scheme alleged herein because it served as a distraction to U.S. regulators to prevent U.S.

regulators from focusing on the substantial number of U.S.-based users accessing the OKX.com

website and exchange.  As of the date of this filing, the OKX US exchange has been rebranded to

OKX and users can access the U.S. exchange through the OKX.com website.

28.    The below graphic provides a simple overview of the web of OKX Group entities and

Star Xu's ownership and control of those entities:



**Key Non-Defendants**

29.     OKCoin Europe Ltd. ("OKC EU") is a Malta limited liability company which operates under the OKX brand and offers the OKX Platform to users in Europe.  OKC EU is a subsidiary of OKX Group.  There are numerous other unnamed entities owned and controlled by OKX Group which either operated OKX.com cryptocurrency exchanges or were otherwise part of the web of OKX Group entities and involved in the scheme alleged herein.

30.     Mingxing Xu, also known as Star Xu ("Star Xu"), is a Chinese entrepreneur who founded OKX Group (formerly OK Group), OKX (formerly OKEx), and OKCoin.  Star Xu founded OKX Group in 2015 and has served as its control person and beneficial owner since its founding.  He also served as the CEO of OKX during the Class Period.  As CEO, he is responsible for overseeing the company's strategy, vision, operations, and growth.  Star Xu's responsibilities included oversight of compliance policies and procedures, including KYC and AML measures.

31.     Jay Hao ("Hao") served as the CEO of OKX from approximately November 2018 until January 2023.  As a CEO, Hao was responsible for overseeing the company's strategy, operations, and growth and would have had direct responsibility for ensuring proper compliance and risk management practices were in place, including with respect to KYC and AML policies and procedures.

32.     Hong Fang ("Fang") serves as the President of OKX, occupying the role since January 2023, and oversees the global branding and rebranding initiatives.  She previously served as CEO of OKCoin from March 2020 to December 2023, as OKCoin's Chairman of the Board from July 2019 to 2020, and as COO.  In these senior leadership roles, she had visibility into and influence over compliance and risk management policies.

33.     Star Xu, Hao, and Fang are collectively referred to herein as the "OKX Officers."

34.     The OKX Officers, as executives in charge of a major cryptocurrency exchange, would have been responsible for implementing and overseeing KYC and AML procedures to prevent illicit activity.  This would have included: (i) establishing customer identification and verification processes; (ii) implementing transaction monitoring systems; (iii) conducting due diligence on high-risk customers; (iv) setting policies around suspicious activity reporting; and (v) ensuring there was adequate funding, staffing, and training of compliance personnel to ensure that any KYC or AML policies and procedures were created and implemented.

35.     As such, the OKX Officers would have been aware of the weaknesses and failures in OKX's KYC and AML policies and procedures that enabled bad actors to use OKX's cryptocurrency platforms for laundering cryptocurrency.  Each of the OKX Officers was a member of the conspiracy alleged herein.

## COMMON FACTUAL ALLEGATIONS

### Background on Cryptocurrency Laundering

36.     A cryptocurrency wallet is an application that functions as a wallet for cryptocurrency.  It is called a wallet because it is used similarly to a wallet that holds cash and credit cards.  Instead of holding these physical items, a cryptocurrency wallet stores the passkeys used to sign for cryptocurrency transactions and provides the interface that lets users access crypto on the blockchain, and interact with protocols, such decentralized exchanges ("DEX") and bridges which enable users to send crypto across different blockchains.  When someone sends their cryptocurrency to another wallet on the blockchain or engages with a protocol, such as a DEX or bridge, a permanent record is created on the ledger for the blockchain so all transactions on the blockchain are trackable.

37.     Blockchain transactions are inherently immutable and transparent.  They are recorded on digital ledgers distributed across a decentralized network of nodes.   These transactions,

encompassing details such as sender and recipient addresses, transaction amounts, and timestamps, are permanently recorded, ensuring the integrity and security of the data.  If a bad actor removes someone's crypto without their permission from their wallet or a protocol and then transfers the crypto to the bad actor's own wallet or tries to withdraw the funds as fiat currency to a bank account, the bad actor could potentially be caught; because experts can employ tools and services to trace the movement of stolen digital assets, facilitating potential recovery.  Therefore, unlike cash or other types of fungible property, cryptocurrency can be tracked after it is removed from the owner's wallet or protocol.

38.     After cryptocurrency is stolen, with the assistance of forensic experts, victims are regularly able to locate the precise location of their assets through the public ledger on the blockchain.  Therefore, even though their cryptocurrency may have been stolen, victims often have a strong ability to recover their stolen assets as long as the information is trackable on the blockchain.

39.     A February 1, 2023 article published on a website of crypto-tracing analysis firm Chainalysis.com titled "2022 Biggest Year Ever For Crypto Hacking with $3.8 Billion Stolen, Primarily from DeFi Protocols and by North Korea-linked Attackers," discussed the tracking benefits of the blockchain, stating in part:

> When every transaction is recorded in a public ledger, it means that law enforcement always has a trail to follow, even years after the fact, which is invaluable as investigative techniques improve over time.  Their growing capabilities, combined with the efforts of agencies like [the Office of Foreign Assets Control] to cut off hackers' preferred money laundering services from the rest of the crypto ecosystem, means that these hacks will get harder and less fruitful with each passing year.

40.     As such, the laundering of the crypto, *i.e.*, the removal of the ability for the stolen cryptocurrency to be tracked on the ledger, is essential for a criminal to benefit from the theft without detection and eliminates a victim's ability to recover their stolen cryptocurrency.

41.     The 2022 Crypto Crime Report by Chainalysis highlights the importance of crypto-laundering as part of the overall theft:

1
2
3

Cybercriminals dealing in cryptocurrency share one common goal: Move their ill-gotten funds to a service where they can be kept safe from the authorities and eventually converted to cash. ***That's why money laundering underpins all other forms of cryptocurrency-based crime. If there's no way to access the funds, there's no incentive to commit crimes involving cryptocurrency in the first place***.

4

**OKX and Its Business**

5
6
7
8
9
10
11
12
13
14
15
16
17
18

42.    In 2015, Star Xu, a Chinese entrepreneur with a technology background, founded OKX Group (formerly OK Group) to develop blockchain and cryptocurrency-related businesses across the world. Prior to this venture, Star Xu launched OKCoin in June 2013, which quickly became one of China's largest Bitcoin exchanges. OKCoin initially focused on the Chinese market but expanded internationally in 2014, opening an office in Singapore. Star Xu, through OKX Group, launched OKX (originally named OKEx) as a global cryptocurrency exchange to serve international markets and offer a wider range of trading products. In 2017, due to regulatory changes in China, OKCoin moved its headquarters to San Francisco, California. In early 2022, OKEx rebranded to OKX and has since become one of the world's largest cryptocurrency exchanges by trading volume, expanding its services to include spot trading, derivatives, DeFi, and NFTs, while establishing a corporate presence in various countries and territories including Malta, Hong Kong, and the United States.

19
20
21
22
23

43.    OKX offers crypto-related services and products to millions of users in over 100 countries. Customers access OKX's services through websites and apps, including OKX.com, where they can deposit, trade, and exchange cryptocurrency. As of October 2024, OKX.com offered more than 300 tokens and 739 pairs of tokens for exchange.

24
25
26
27
28

44.    OKX.com enables customers to open accounts and engage in cryptocurrency transactions. When a user opens an account, OKX.com assigns them a custodial virtual currency wallet – *i.e.*, a wallet in OKX's custody, which enables the user to conduct various types of transactions on the platform, such as swapping one crypto for another, transferring funds to other

OKX accounts, withdrawing crypto out of OKX.com, and sending the crypto to external virtual currency wallets or fiat bank accounts. Generating a large number of trades and being highly liquid is very important for a crypto-exchange. A highly liquid market is generally more desirable from the end-user's perspective because the bid and ask spreads will typically be narrower and larger trades can be conducted more easily. A highly liquid exchange also makes it easier for bad actors to exchange large amounts of stolen crypto.

45. Even though OKX.com was not licensed to do business in the United States, it permitted U.S.-based users to open accounts and utilize its services. To access its services, a U.S.-based user simply needed to access the exchange by using a virtual private network ("VPN") to make it appear as if the user was logging in from outside the United States. Moreover, OKX was well-aware that U.S. users could easily evade its official KYC policies and its employees purposefully advised users in the U.S. of how to do so.

46. As discussed in more detail below, since OKX.com serves users in the United States, it was inappropriately acting as an unlicensed money transmitter and money services business in violation of U.S. laws and regulations. Because it acts as a money transmitter and money services business, OKX.com was required to comply with the BSA and create and implement KYC and AML policies and procedures. OKX.com, however, failed to adequately create or implement KYC and AML policies and procedures and violated the BSA. As a result of OKX.com's failure to adequately implement KYC and AML policies and procedures, OKX.com became a magnet and a hub for bad actors to launder stolen cryptocurrency.

47. In addition to offering customers from around the world access to OKX.com during the Class Period, OKX provided access to a more limited cryptocurrency exchange and digital asset trading platform at OKCoin.com, which was provided by OKX US and under the OKX Group of companies. OKX US is a licensed money transmitter and money services business registered with

the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of Treasury.  As a licensed money transmitter and money services business in approximately 47 states, OKX US was required to comply with the BSA and create and implement adequate KYC and AML policies and procedures.  As alleged herein, even though OKX made it appear that it complied with KYC and AML requirements with respect to U.S.-based customers, Defendants knowingly failed to dedicate sufficient financial or staffing resources to ensure that any purported KYC or AML policies or procedures were effective.

48.    Even though OKCoin.com and OKX.com were separate websites and exchanges throughout much of the Class Period, they were both part of OKX Group and OKX, as described by OKX on its website:



Who We Are

Okcoin is a globally licensed exchange with offices in San Francisco, San Jose, New York City, Malta, Hong Kong, Singapore, and Japan. We are a collective of global citizens with a common passion to help decentralize finance and level the economic playing field for everyone around the world.

**6**
Global Offices

**300+**
Employees

**190+**
Countries Served

**1M+**
Customers

49.    As illustrated above, OKX.com and OKCoin.com – as part of OKX Group – worked cooperatively with each other.  OKX.com is appealing to U.S.-based customers because it offers more tokens and is more liquid for large trades than OKCoin.com.  Therefore, in addition to marketing the OKCoin.com exchange to U.S.-based customers, Defendants also marketed the OKX

brand and the OKX.com exchange to U.S.-based customers, which resulted in numerous U.S.-based users accessing OKX.com.

50.     Defendants engaged in substantial marketing and solicitation efforts to acquire U. S.-based users for OKX.com.  Since at least 2022, OKX, through Aux Cayes, sponsored the Tribeca Festival in New York.  Through this sponsorship, the OKX brand was promoted along with the Tribeca Film Festival by ads posted throughout Manhattan.  OKX also promoted OKX.com domestically through affiliate marketing campaigns, where third-party "affiliates" located in the U.S. promoted the OKX platform in exchange for fees generated by new customer referrals.  OKX encouraged existing customers to promote the exchange and allowed these customers to benefit from recruiting users in the U.S.  Further, OKX participated in major crypto conferences and events in the United States, such as Bitcoin Miami, to market its services.

51.     Ultimately, in an effort to streamline marketing and customer acquisitions, OKX Group announced in 2023 that it would begin a global rebranding process and consolidation under the OKX name.  It began the process with operations in the Bahamas, Hong Kong, Brazil, Singapore, Australia, and Argentina.  OKX US began the process of rebranding in July 2024.  As of the date of this Complaint, the rebranding in the United States is complete and U.S. users can access the exchange previously known as OKCoin at OKX.com.

**Overview of Defendants' Scheme and the OKX Crypto-Wash Enterprise**

52.     Defendants ran OKX Group and the OKX Platform with utter disregard for policies and procedures that would prevent bad actors from laundering cryptocurrency through the OKX Platform.

53.     For years after its launch, OKX.com allowed users to open accounts by simply providing an email address and password and did not require customers to provide KYC information.

54.     Even though OKX.com may have modified its policies over time and established verification tiers where personal information was purportedly required for enhanced services, such as withdrawing up to 100 BTC per day, for years customers could access OKX.com, utilize its cryptocurrency exchange, and withdraw substantial sums, such as up to approximately 10 BTC per day, or approximately $50,000 per day, without providing required KYC information.  Importantly, even when OKX began asking users to provide personal information, OKX failed to implement policies or procedures to adequately verify that information, which enabled bad actors to use fake identities on OKX's Platform.

55.     Eventually, after receiving international regulatory pressure to collect KYC information, OKX.com announced in May 2023 that it was purportedly increasing its KYC requirements for those seeking to withdraw more than $5,000 per day and that such information needed to be provided by approximately September 2023.  Those new purported KYC policies, however, continued to be inadequate and failed to prevent bad actors from using OKX.com to launder cryptocurrency, because OKX.com failed to properly dedicate sufficient financial or staffing resources, verify customer information, or monitor illicit wallets or suspicious transactions.

56.     According to a February 7, 2024 article in CryptoNavigator.net titled "OKX's KYC: Fake IDs Bypass Verification," OKX's customers were able to open accounts and trade cryptocurrency with fake IDs.  According to the article, "OKX finds itself under fire for allegedly accepting fake IDs during its Know-Your-Customer (KYC) verification process" and that "[j]ournalists successfully passed the verification process using a fake British passport, raising concerns about the effectiveness of OKX's security measures."  The article further stated, "[a]dding fuel to the fire, an OKX customer support representative reportedly revealed that thorough KYC/AML checks might not be conducted immediately upon account creation or crypto deposits," which "potentially exposes a loophole, raising questions about user verification procedures."

57.     According to a March 21, 2024 article on Cryptopolitan.com titled "India's crypto regulations push OKX to cease local services," OKX announced it will halt its operations in India due to "local regulatory hurdles."  According to the article, "OKX's exit is seen as a direct response to India's stringent regulatory environment" because India's Financial Intelligence Unit ("FIU") had "issued notices to several foreign crypto exchanges, including OKX, under the Prevention of Money Laundering Act of 2002" as part of "a broader effort to bring virtual digital asset service providers under the Anti Money Laundering/Counter Financing of Terrorism (AML-CFT) framework."

58.     Therefore, bad actors were able to open accounts, transfer cryptocurrency into OKX, trade that cryptocurrency on OKX's Platform, and withdraw the exchanged cryptocurrency without providing verifiable self-identifying information.

59.     OKX.com's practice of permitting users to open accounts, conduct transactions, and withdraw cryptocurrency without adequate verification violated U.S. laws and regulations.

60.     Defendants knew the OKX Platforms were required to, but failed to, implement adequate KYC and AML procedures.

61.     Defendants willfully violated these important U.S. laws and regulations in order to grow the business and gain market share.

62.     Even though a portion of OKX Group's users may have been legitimate, Defendants' conduct turned the OKX Platform into a magnet and hub for bad actors to use OKX to launder stolen cryptocurrency and this portion of OKX Group's business served as the OKX Crypto-Wash Enterprise.

63.     According to the DOJ SOF, "OKX was used by numerous customers as a vehicle for laundering the proceeds of suspicious and criminal activities, including more than ***five billion dollars of suspicious transactions and illicit proceeds***[.]"

AMENDED COMPLAINT – Case No. 4:25-cv-00368-JSW

64.     Defendants knew that OKX's failure to comply with KYC and AML laws and regulations, such as the Bank Secrecy Act, enabled bad actors, including criminals, crypto-thieves, and users located in sanctioned jurisdictions, to use the OKX Crypto-Wash Enterprise to launder digital assets so the assets would not be trackable by the authorities.

65.     The OKX Crypto-Wash Enterprise provided an effective way for bad actors to steal and launder crypto.  Once someone steals crypto stored in a wallet or in a protocol, they would deposit the stolen cryptocurrency into their OKX wallet.  Next, they would engage in transactions within the exchange, trading the stolen cryptocurrency for other cryptocurrencies or tokens offered on the platform.  Once the funds are sufficiently converted, the thief would withdraw them from the exchange, potentially through multiple accounts or wallets, to further complicate tracing efforts.  By leveraging the anonymity and liquidity provided by the OKX Crypto-Wash Enterprise, individuals laundered billions of dollars in cryptocurrency while evading detection.

66.     The laundering of the stolen cryptocurrency through the OKX Crypto-Wash Enterprise removed the ability for victims to track and potentially recover their cryptocurrency. Before the laundering, victims had a considerable likelihood of recovering their stolen cryptocurrency assets with the cooperation of the authorities.  The laundering of the stolen cryptocurrency, however, eliminated their ability to track and potentially recover their assets.

67.     Defendants' refusal and failure to follow the law and implement AML and KYC policies and protocols at OKX.com enabled bad actors to launder crypto at OKX.com.  Had Defendants complied with the law and ensured OKX implemented adequate AML and KYC policies, OKX would have identified potential crypto laundering transactions on OKX.com, would have reported them to the authorities, and would have prevented the crypto belonging to Plaintiffs and the members of the Class from being laundered and withdrawn from OKX.com.

68.     A key reason for this is because a substantial portion of crypto laundered by bad actors is transferred to OKX.com from crypto wallets previously identified as wallets associated with illicit crypto activities.  In fact, a January 18, 2024 *Reuters* article titled "Illicit crypto addresses received at least $24.2 billion in 2023 – report," stated:  "At least $24.2 billion worth of crypto was sent to illicit crypto wallet addresses in 2023, including addresses identified as sanctioned or linked to terrorist financing and scams," according to crypto research firm Chainalysis.

69.     During the Class Period, Defendants had access to tools, platforms, and services that would have enabled them to easily identify if crypto was transferred to an OKX.com account from a crypto wallet which had been identified as being associated with illicit activity.  According to a March 11, 2022 article on CoinDesk.com titled "How Authorities Track Criminal Crypto Transactions," blockchain analytic firms like Chainalysis and CipherTrace have created tools that identify wallets associated with illicit activities and that "it is possible to ascertain how many wallets a criminal controls from a single transaction that might've occurred after a hack, rug pull or any type of unlawful cyber activity was perpetrated."

70.     Further, OKX failed to use these readily available tools to prevent criminals and bad actors from using its exchange.  According to the DOJ SOF, until about May 2023, "***OKX did not adequately or consistently use commercially available software to monitor and detect suspicious activity, including money laundering***, and OKX did not have adequate controls to determine whether either party to transactions on the exchange was potentially subject to sanctions imposed by the U.S. Treasury Department."  OKX belatedly implemented additional security protections to prevent crypto theft and hacking.  According to a March 17, 2025 article published on cointelegraph.com entitled "OKX suspends DEX aggregator to stop 'further misuse' by Lazarus," OKX's decentralized Platform launched a "hacker address detection system" in March 2025 that

operated "in addition to a system to track the hacker's latest addresses and block them on [OKX's] centralized exchange in real time."

**OKX Was Subject to, and Violated, Important U.S. Laws and Regulations**

71.    Once OKX.com began conducting business in the United States, it became subject to strict regulations aimed at, among other things, creating a protocol for identifying suspicious activity that might indicate potential money laundering operations and other illegitimate activities by its customers.  In addition, OKX.com was required to have procedures in place for reporting illicit activities to relevant authorities.

72.    Any purported KYC or AML policies or procedures which may have been set up by OKX for either OKX.com or OKCoin.com were for appearances only, because Defendants' goal was for clients to continue using the OKX Platform in violation of any purported safeguards for regulatory compliance.  Defendants, therefore, knew bad actors were using the OKX Platform for illicit activities, such as laundering stolen cryptocurrency, and failed to take steps to stop them.

73.    Specifically, OKX.com was a cryptocurrency exchange that did business wholly or in substantial part within the United States, including by providing services to a substantial number of U.S. customers.  OKX.com was a "money transmitter," which is a type of money services business. 31 C.F.R. §1010.100(ff).  As a cryptocurrency exchange, OKX.com was a money transmitter because it was "[a] person that provides money transmission services," meaning "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means," including through "an electronic funds transfer network" or "an informal value transfer system." 31 C.F.R. §1010.100(ff)(5).

74.    Money transmitters, such as OKX.com (and OKCoin.com), were required to register with FinCEN pursuant to 31 U.S.C. §5330 and 31 C.F.R. §1022.380 within 180 days of

establishment or risk criminal penalties pursuant to 18 U.S.C. §1960. OKX.com, as a money transmitter, was also required to comply with the BSA, 31 U.S.C. §5311 *et seq.*, for example, by filing reports of suspicious transactions that occurred in the United States, 31 U.S.C. §5318(g), 31 C.F.R. §1022.320(a), and implementing an effective AML program "that [was] reasonably designed to prevent the money services business from being used to facilitate money laundering and the financing of terrorist activities." 31 C.F.R. §1022.210.

75.     An AML program was required, at a minimum and within 90 days of the business's establishment, to "[i]ncorporate policies, procedures, and internal controls reasonably designed to assure compliance" with requirements that an MTB file reports, create and retain records, respond to law enforcement requests, and verify customer identification (KYC requirement). 31 C.F.R. §1022.210(d)(1), (e).

76.     OKX.com failed to register with FinCEN or comply with the BSA as set forth above.

77.     Additionally, IEEPA, 50 U.S.C. §1701 *et seq.*, authorized the President of the United States to impose economic sanctions on countries, groups, entities, and individuals in response to any unusual and extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat. Section 1705 provided, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued [pursuant to IEEPA]." 50 U.S.C. §1705(a).

78.     The U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") administered and enforced economic sanctions programs established by executive orders issued by the President pursuant to IEEPA. In particular, OFAC administered and enforced comprehensive sanctions programs that, with limited exception, prohibited U.S. persons from engaging in transactions with a designated country or region, including Iran, the Democratic People's Republic

of Korea ("DPRK" or "North Korea"), Syria, and the Crimea, Donetsk, and Luhansk regions of Ukraine, among others.

79.     FinCEN's Final Rule on Customer Due Diligence Requirements for Financial Institutions require that OKX.com establish and maintain written policies and procedures for AML and KYC protocols.  Specifically, FinCEN's customer identification rules require that OKX.com maintain a written Customer Identification Program appropriate for its size and type of business that, at a minimum, includes "risk-based procedures for verifying the identity of each customer" that enable OKX.com to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §1020.220(a)(1), (2).

80.     The Bank Secrecy Anti-Money Laundering Manual promulgated by the Federal Financial Institutions Examination Council ("FFIEC Manual") also summarizes industry sound practices and examination procedures for customer due diligence on accounts that present a higher risk for money laundering and terrorist financing.  The FFIEC Manual sets forth a matrix for identifying high risk accounts that require enhanced due diligence.  Such accounts include those that have "large and growing customer[s] base[d] in a wide and diverse geographic area"; or "[a] large number of noncustomer funds transfer transactions and payable upon proper identification . . . transactions"; and "[f]requent funds from personal or business accounts to or from higher-risk jurisdictions, and financial secrecy havens or jurisdictions," such as OKX.com's deposit accounts.

81.     OKX.com and OKCoin.com were required to comply with heightened due diligence for deposit accounts.  According to the FFIEC Manual, *OKX's due diligence was required to include assessments to determine the purpose of the account, ascertain the source and funding of the capital, identify account control persons and signatories, scrutinize the account holders' business operations, and obtain adequate explanations for account activities*.

82.    OKX's general customer due diligence program was required to include protocols to predict the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and furnish a means for OKX.com to notice unusual or suspicious transactions for each customer.

83.    Furthermore, OKX's customer due diligence process must be able to identify any of a series of money laundering "red flags" as set forth in the FFIEC Manual, including: (i) frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers; (ii) repetitive or unusual funds transfer activity; (iii) funds transfers sent or received from the same person to or from different accounts; (iv) unusual funds transfers that occur among related accounts or among accounts that involve the same or related principals; (v) transactions inconsistent with the account holder's business; (vi) customer use of a personal account for business purposes; (vii) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; and (viii) multiple high-value payments or transfers between shell companies without a legitimate business purpose.  The due diligence process must also enable OKX.com to take appropriate action once such "red flags" are identified.

84.    As alleged herein, Defendants willfully and flagrantly ignored these important U.S. rules and regulations, which enabled the OKX Platform to become a central hub of crypto trading for bad actors, including those who sought to utilize the OKX Crypto-Wash Enterprise.

**AML and KYC Laws and Regulations Are Intended to Catch Criminals and Protect Innocent Consumers Like Plaintiffs**

85.    The BSA, the USA PATRIOT Act, and related AML/KYC regulations were enacted to combat money laundering and terrorist financing.  These laws and regulations protect consumers by aiding government officials and law enforcement in efforts to stop or identify the culprits of illicit transactions.

86.     Pursuant to the USA PATRIOT Act, OKX was required to implement KYC programs in order to identify its customers.  These KYC regulations exist in order to prevent known bad actors from engaging in illicit financial transactions.

87.     MSBs, like OKX, must file a Suspicious Activity Report ("SAR") whenever they uncover information that raises suspicion of, *inter alia*, insider activity, money laundering, terrorist financing, and other criminal activity.  SARs are archived for five years after they are filed.

88.     U.S. governmental entities and law enforcement rely on SARs to detect patterns and trends in organized and personal financial crimes.  This allows law enforcement to anticipate and counteract criminal and fraudulent behavior.

89.     Victims of financial crimes, such as Plaintiffs and the members of the Class, are beneficiaries of the rules and regulations governing KYC and AML policies and procedures, including those in the BSA and the USA PATRIOT Act.  These rules exist to prevent known or suspicious bad actors from opening and maintaining accounts at financial institutions and to enable the victims of financial crimes to track their stolen assets and identify the culprits.

90.     The rules also exist to prevent criminals engaged in prior suspected conduct from being prevented from continuing illicit activities.

91.     Because applicable laws require MSBs to implement and maintain AML and KYC policies and procedures, it was reasonably foreseeable that OKX's failure to implement and maintain adequate AML and KYC policies and procedures would cause bad actors to launder stolen cryptocurrency through OKX.

92.     Had Defendants complied with applicable laws and regulations, including, but not limited to, the BSA, OKX would not have become a magnet and hub for cryptocurrency laundering, and it is highly unlikely that Plaintiffs' stolen cryptocurrency would have been laundered through OKX and rendered untraceable thereafter.

**OKX Pleads Guilty to Violating U.S. Laws and Regulations and Settles with the DOJ**

93.    On February 24, 2025, Defendant Aux Cayes entered into a guilty plea agreement to settle claims alleged by the DOJ in the U.S. District Court for the Southern District of New York.

94.    Specifically, Aux Cayes agreed to plead guilty to the following criminal charge contained in the Information filed by the DOJ against Aux Cayes (the "DOJ Aux Cayes Information" or "Information"): operation of an unlicensed money transmitting business in violation of Title 18, United States Code, §1960.   In connection with the settlement, Aux Cayes agreed to forfeit $420,353,574 and to pay a criminal fine of $84,457,629 for a total financial penalty of $504,811,203. Additionally, Aux Cayes agreed to retain an independent compliance monitor for two years after entry of the judgment by the Court and adopt new, or enhance existing, compliance controls to prevent U.S. users, ensure adequate KYC policies, evaluate high-risk customers, and prevent circumvention of compliance controls.

95.    In connection with its guilty plea, Aux Cayes **admits, agrees, and stipulates** that the factual allegations set forth in the Information filed by the DOJ **are true and correct**, that it is responsible for the acts of its officers, directors, employees, and agents described in the SOF, and that the Information and SOF **accurately reflect Defendant's criminal conduct**.

96.    On February 24, 2025, the DOJ issued a press release titled "OKX Pleads Guilty To Violating U.S. Anti-Money Laundering Laws And Agrees To Pay Penalties Totaling More Than $500 Million," which discussed Aux Cayes' guilty plea, stating in part:

> Aux Cayes Fintech Co. Ltd, d/b/a "OKEx," d/b/a "OKX" ("OKX"), a Seychelles-based entity, that since at least 2017 has operated OKX, one of the largest cryptocurrency exchanges in the world, pled guilty today to one count of operating an unlicensed money transmitting business.  In connection with today's guilty plea and sentencing, OKX agreed to pay monetary penalties totaling more than $504 million.
>
> ***Acting U.S. Attorney Matthew Podolsky said: "For over seven years, OKX knowingly violated anti-money laundering laws and avoided implementing required policies to prevent criminals from abusing our financial system.  As a***

*result, OKX was used to facilitate over five billion dollars' worth of suspicious transactions and criminal proceeds*. Today's guilty plea and penalties emphasize that there will be consequences for financial institutions that avail themselves of U.S. markets but violate the law by allowing criminal activity to continue."

FBI Assistant Director in Charge James E. Dennehy said: "***For years, OKX flagrantly violated U.S. law***, actively seeking customers in the United States—including here in New York—and even going so far as to advise individuals to provide false information to circumvent requisite procedures. ***Furthermore, in their failure to adhere to U.S. law, significant illicit transactions which furthered other criminal activity went undetected on their platform***. Blatant disregard for the rule of law will not be tolerated, and the FBI is committed to working with our partners across government to ensure that corporations that engage in this type of conduct are held accountable for their actions."

97.    Additionally, on March 21, 2025, the Securities and Exchange Commission of Thailand ("SEC of Thailand") issued a press release titled "SEC [of Thailand] files a criminal complaint against OKX platform provider and nine supporters for operating digital asset exchange business without license," announcing that the SEC of Thailand had filed a criminal complaint against Aux Cayes for operating OKX.com in the country without a license and in violation of Thai law.  In its press release, the SEC of Thailand noted both the danger to consumers and the opportunity for bad actors created by Aux Cayes' unlicensed operation of OKX.com, stating in relevant part, "[t]he public and investors should exercise caution when using services from unlicensed digital asset businesses as they will not be protected under the law and may be exposed to risks of frauds and scams as well as the potential misuse of funds for money laundering by offenders."

**OKX Encouraged U.S. Users to Use OKX.com and Evade OKX's Own Compliance Controls Through the Use of VPNs and Other Methods**

98.    Beginning in 2017, OKX had an official policy preventing U.S. users from transacting on OKX.com.  From 2017 through at least 2023, however, OKX allowed, assisted, and encouraged U.S. users to transact on OKX.com.

99.     OKX had a longstanding policy of allowing U.S. users to participate in simulated trades on its Platform.  According to the DOJ SOF, "from OKX's founding until at least in or about 2023, OKX nonetheless permitted U.S. persons to register accounts on the exchange and conduct simulated trades (sometimes referred to as 'demo trades')."

100.     OKX eventually implemented KYC policies and procedures in November 2022 which were purposefully inadequate and contained clear loopholes to allow users on the OKX Platform without providing the necessary KYC information.

101.     OKX provided retail users with multiple methods for evading KYC requirements. The DOJ SOF stated in relevant part:

> From its founding through approximately November 2022, OKX allowed retail customers the option to create an account, receive and transfer funds, and place trades without completing a know-your-customer ("KYC") process, and through at least early 2023 OKX allowed accounts created before November 2022 to continue to receive and transfer funds, and place trades, without completing a KYC process.

102.     Furthermore, OKX allowed users to evade KYC requirements through the use of third party entities known as "non-disclosure brokers."  According to the DOJ SOF, until approximately early 2024, "OKX also allowed customers to place trades on the exchange through third-party entities, without the third-party entity disclosing any identifying information to OKX about the customers on whose behalf the trades were placed."  Thus, "anonymous customers" were permitted to make trades through third-parties until approximately early 2024.  Internally, OKX referred to the third-party entities as "non-disclosure brokers" or "ND brokers."

103.     Though OKX adopted a policy in 2017 to block users with IP addresses located in the U.S., OKX knew this policy was highly ineffective at preventing U.S.-based users from accessing the exchange.  The DOJ SOF stated in relevant part:

> As **OKX knew . . . the IP Ban did not, in actuality, prevent U.S. customers from accessing OKX (through a work-around process) and trading on the exchange**. Since its founding, OKX's website was accessible from the United States, and **U.S.**

*customers could circumvent the IP Ban by using a virtual private network ("VPN") to mask their true location.*

\*       \*       \*

Further, *until at least 2023, OKX permitted customers to register an account, deposit cryptocurrency, and place trades on the exchange without providing personal identifying information* such as a name, date of birth, and country of residence. U.S. customers could therefore trade, and did trade, on OKX by using a VPN to circumvent the IP Ban and declining to identify themselves or their country of residence during the KYC process. Practically speaking, therefore, *OKX understood individuals in the United States were able to easily create and utilize OKX trading accounts* contrary to the letter of the company's policy on U.S. customers.

104. Moreover, certain employees of OKX, including senior executives, were well-aware that U.S. users were registering and trading on OKX despite the supposed IP ban in place. The DOJ SOF stated in relevant part:

> OKX and certain of its employees knew that U.S. customers were registering and trading on OKX despite the IP Ban and OKX's official policy prohibiting U.S. customers. For example, in an October 2020 internal email, *an OKX employee wrote that the IP Ban could be circumvented because "it can't rule out cases where users use VPN[s] to hide their real IPs*." Similarly, in a 2021 internal OKX message amongst business development employees at OKX, one OKX employee asked, "how do we work with brokers who have customers from US" and noted "I know that US citizens are not allowed to trade on OKEX," to which another OKX employee responded "VPN." Additionally, in 2022, an OKX marketing employee suggested in an internal OKX message that OKX market the exchange to "US day traders who'd know to use a VPN for the exchange," and a senior OKX marketing officer responded with a "thumbs up," indicating approval of the suggestion. Moreover, in a 2023 internal chat with an OKX employee, *a senior OKX executive acknowledged that there had been an issue that "without full kyc, US people can use vpn to skip our IP ban*."

105. OKX was put on notice that the OKX.com exchange was used by substantial numbers of users in the U.S. through numerous reports it received during the Class Period. According to the DOJ SOF, "OKX also received multiple reports of telecommunications traffic based in the U.S. with OKX . . . [indicating] that *a substantial number of U.S. persons were regularly accessing OKX's website*." Additionally, a "prominent online search company" provided regular reports to OKX that showed "*tens of thousands of U.S. I.P. addresses were used to access OKX's website*[.]"

Moreover, "another company that provided two-factor authentication services . . . sent OKX monthly bills reflecting that **tens of thousands** of two-factor authentication messages were being **sent to customers in the United States each month**."

106.    It was publicly known since OKX's founding that OKX's Platform was easily accessible to U.S. users despite the IP ban and OKX's policy restricting U.S. access.

107.    Posts on prominent social media websites provided instructions on how to readily access the OKX Platform without offering KYC information.  For example, below is an exchange on Reddit.com between OKX.com users based in the United States discussing that they access OKX.com with a VPN and can utilize OKX.com's exchange without providing KYC information:



108.    Additionally, according to the DOJ SOF, "[a]t least one OKX customer produced a publicly-available, step-by-step instructional video educating U.S. customers about how to register with OKX using a VPN."

109.    OKX itself posted on social media to inform users on how to evade KYC requirements.  According to the DOJ SOF, "***OKX promoted itself*** on social media ***as an exchange that allowed its customers to trade without providing identifying information***."  In 2022, for example, an account affiliated with OKX wrote that "KYC is not mandatory for our users to trade on OKX" on a social media thread entitled "OKX REQUIRES KYC FROM ITS CUSTOMERS?"

110.    Even after OKX began requiring every customer to provide KYC information, OKX employees continued to advise U.S. customers on how to evade the KYC requirement.  According to the DOJ SOF, "OKX employees advised customers how to provide inaccurate information to circumvent the company's KYC process and official policy prohibiting U.S. customers."  In April 2023, an OKX employee "encouraged a potential U.S. customer to open an account by providing false information about the customer's nationality during the KYC processing."  The OKX employee wrote to the U.S. customer "***I know you're in the US but you could just put a random country and it should go through***.  You just need to put [n]ame, nationality, and ID number.  You could just put United Arab Emirates and random numbers for the ID number."  Likewise in January 2024, the "same employee wrote to another potential U.S. customer and asked if the individual had 'any workaround on KYC outside of the US to make it potentially work.'"  The OKX employee's messages illustrate the ease at which U.S. users could circumvent the Platform's KYC procedures.

111.    OKX relied on U.S. users to provide substantial liquidity for OKX.com and U.S. users enabled the exchange to grow into one of the world's largest.  According to the DOJ SOF, OKX employees created an internal document entitled "Trust and Product," which "outlined and recommended strategies for OKX to 'improve brand trust in the United States' and discussed trading

activity on OKX by multiple large U.S. institutions." The "Trust and Product" document also "made recommendations for how OKX could improve its relationship with U.S. Institutional Customers and increase trading volume on OKX."

112.    According to the DOJ SOF, before and during the Class Period, "OKX allowed several U.S. Institutional Customers to trade on the exchange." These high-volume U.S. users were an integral part of OKX.com's success as they "were responsible for significant volume on the exchange and were some of OKX's largest customers." One high-volume U.S. user in particular "conducted approximately $1.2 trillion in spot and derivatives transactions" on OKX.com from approximately 2019 through 2023. In 2020, "two of OKX's three largest customers were U.S. Institutional Customers." The DOJ SOF noted that these high-volume U.S. users "contributed substantially to OKX's growth and its bottom line."

**Defendants' Failure to Implement KYC and AML Procedures Enabled Bad Actors to Launder Crypto at the OKX Crypto-Wash Enterprise**

113.    Even though OKX operated in substantial part in the United States, OKX's KYC and AML protocols, as required by the BSA, were inadequate and essentially nonexistent and failed to come close to satisfying industry standards. Defendants' decision to prioritize growth over compliance with U.S. legal requirements meant they facilitated billions of dollars of cryptocurrency transactions on behalf of OKX's customers without implementing appropriate KYC procedures or conducting adequate transaction monitoring.

114.    Thieves laundered stolen cryptocurrency through OKX.com because OKX failed to implement security measures that would confirm its accountholders lawfully possessed the cryptocurrency deposited in OKX.com accounts, including the ones in which Plaintiffs' stolen cryptocurrency were deposited.

115.    A primary way that OKX.com facilitated transactions by bad actors was by permitting customers to open accounts, trade crypto on its exchange, and withdraw substantial amounts of

cryptocurrency without OKX adequately verifying those customers.  Unlike legitimate virtual currency exchanges, OKX.com did not require these users to validate their identity information by providing official identification documents or by verifying that the information was accurate and legitimate.  Accounts were therefore easily opened by bad actors, including by users in the United States.

116.    OKX's practices encouraged cryptocurrency hackers and thieves to steal cryptocurrency and launder it at OKX by depositing it at OKX.com, converting the illegally obtained asset, and withdrawing it from OKX.com – all without providing verifiable identification.  As a direct and proximate result of Defendants' and the OKX Officers' failure to comply with KYC and AML rules and regulations, Plaintiffs and the Class had crypto stolen and laundered at the OKX Crypto-Wash Enterprise.

117.    Due in part to OKX's failure to implement KYC procedures and an effective AML program, bad actors used OKX.com's exchange in various ways, including: (i) operating mixing services that obfuscated the source and ownership of cryptocurrency; (ii) transacting illicit proceeds from ransomware variants; and (iii) moving proceeds of darknet market transactions, exchange hacks, and various internet-related scams.

118.    Instead of preventing bad actors from using OKX.com as required under U.S. law, Defendants took steps to ensure bad actors had access to the OKX Crypto-Wash Enterprise by enabling the wide variety of money and cryptocurrency laundering they knowingly facilitated through OKX.com.

119.    Defendants knew OKX.com's substantial U.S. user base required it to register with FinCEN and comply with the BSA.  Rather than registering with FinCEN and complying with the BSA, Defendants – in furtherance of the OKX Crypto-Wash Enterprise – marketed OKCoin.com as a U.S.-based exchange which would register with FinCEN and purportedly conduct KYC and

implement AML policies and procedures for U.S.-based users.  OKCoin.com became licensed in most U.S. states and registered as a money services business ("MSB") with FinCEN.  OKX Group oversaw OKCoin.com's U.S. operations.

120.    Even though OKX served U.S.-based users through OKCoin.com, Defendants knew that many U.S.-based users preferred to use OKX.com because OKX.com offered substantially more tokens on its exchange and offered much larger trading volume and liquidity.  Accordingly, a primary purpose of OKCoin.com's U.S. operations was to enable OKX.com to continue evading U.S. legal and regulatory requirements and reduce regulatory pressure on OKX.com.  Even though OKX may have blocked some U.S. users who did not use a VPN on OKX.com and redirected them to OKCoin.com, Defendants and the OKX Officers continued to allow U.S.-based users to use OKX.com with a VPN.

**Plaintiffs and the Class Suffered Financial Harm from the OKX Crypto-Wash Enterprise**

121.    As a result of OKX's conduct and systemic failures to require KYC and implement AML, Plaintiffs and Class members have been damaged.

122.    For example, on or about April 12, 2023, digital assets (23.212 Bitcoin and 26.7 Ethereum) were stolen from accounts Plaintiff Watt maintained at two separate cryptocurrency exchanges and in a private cryptocurrency wallet while he resided in the United States.  One of the exchanges used by Plaintiff Watt to store his crypto was a Northern California-based exchange with its headquarters located in San Francisco, California.  The value of those assets at the time of theft was approximately Seven Hundred Twenty-Five Thousand Dollars ($725,000.00 USD).

123.    After Plaintiff Watt's cryptocurrency was stolen it was traceable on the blockchain so the location of the cryptocurrency could, with the assistance of a forensic expert, be identified and potentially recovered.  OKX, however, failed to implement adequate KYC and AML policies and procedures so the bad actors who stole his cryptocurrency were able to launder his cryptocurrency

through OKX.  As a result of the laundering of his stolen cryptocurrency through OKX.com, Plaintiff Watt lost the ability to track and potentially recover his stolen cryptocurrency.

124.    Following the theft of Plaintiff Watt's assets, a cryptographic tracing firm investigated the theft and traced the assets.  Some of the assets stolen from Plaintiff Watt in the United States were transferred to the following address(es) held at OKX, as indicated in the chart below (the "Addresses") – believed to be owned or controlled by the thief or an unknown third party to whom the thief has transferred those stolen assets and which have been used to launder the assets stolen from Plaintiff Watt – and those digital assets are believed to still be held there:

Wallets at OKX into which stolen funds were deposited:

BTC Addresses:  3C7USWmsGd4pnSiHYysU8RHnWyuRKAi54W
                3AAJ8CgwoPxecTbWxmzGAqzKE8j799QdsQ
                36gQg3DfZsJPdNxwXk8esBodR26tHeKpSR

ETH Addresses:  0xd49cd43230860f7A244D52FCD78a43CbE068e8Ff
                0x7589A82F2e8A19b0E414Ba5215181dE8051e4e60

| Date | Transaction ID | Source Address | Destination Address | Coin | Funds under claim (stated in cryptocurrency unit) |
|---|---|---|---|---|---|
| 4/12/2023 *[Watt's crypto exchange account to Scammer's wallet]* | 60756de73ba715e95 c1c90b682387cd45f 86840a7c9134b1d4a 82e76a96ce674 | 60756de73ba7 15e95c1c90b6 82387cd45f86 840a7c9134b1 d4a82e76a96c e674 | 3BCqTnJw4U DfTMFhrwhgj ezTbbJPHNgi do | BTC | 0.321947 |
| 4/16/2023 *[Scammer's wallet to OKX]* | 119debb9c512d101 1dc4400f8b7989191 1529905e02399333 557d2dac3f98958 | 119debb9c512 d1011dc4400f 8b7989191152 9905e0239933 3557d2dac3f9 8958 | **36gQg3DfZsJ PdNxwXk8es BodR26tHeK pSR** | BTC | 0.321947 |
| | | | | | |
| 4/18/2023 *[Watt's crypto exchange account to Scammer's wallet]* | cb9d0c6515e13ae3f 17f4f47f71d7dea67 07184ac33404de9dd 40a0dc087d098 | cb9d0c6515e1 3ae3f17f4f47f 71d7dea67071 84ac33404de9 dd40a0dc087d 098 | 3BCqTnJw4U DfTMFhrwhgj ezTbbJPHNgi do | BTC | 0.8085144 |

| Date | Transaction ID | Source Address | Destination Address | Coin | Funds under claim (stated in cryptocurrency unit) |
|---|---|---|---|---|---|
| 4/19/2023 <br><br> *[Scammer's wallet to OKX]* | b24adc29ac48df21d 053b2bcd59aaf02d3 bc522873fca5dc69e 74ef549af1104 | b24adc29ac48 df21d053b2bc d59aaf02d3bc 522873fca5dc 69e74ef549af1 104 | **3C7USWmsG d4pnSiHYysU 8RHnWyuRK Ai54W** | BTC | 0.8085144 |
| 4/20/2023 <br><br> *[Watt's crypto exchange account to Scammer's wallet]* | 0e1f9d3a15a84d7c6 25b6494fbbdd91aaf 3b8b8266b8857445 9d8057eb1e1a2e | 0e1f9d3a15a8 4d7c625b6494 fbbdd91aaf3b8 b8266b885744 59d8057eb1e1 a2e | 3BCqTnJw4U DfTMFhrwhgj ezTbbJPHNgi do | BTC | 0.8598781 |
| 4/19/2023 <br><br> *[Watt's crypto exchange account to Scammer's wallet]* | a5761b99c11d3d00 04095169a0d9eee2f 90a9a88677bda1243 85c631310bc9cb | a5761b99c11d 3d0004095169 a0d9eee2f90a9 a88677bda124 385c631310bc 9cb | 3BCqTnJw4U DfTMFhrwhgj ezTbbJPHNgi do | BTC | 0.2899216 |
| 4/21/2023 <br><br> *[Watt's crypto exchange account to Scammer's wallet]* | 5c74c59284ab188e2 21cff7878e7543069 f97c7b79014f1d9c8 03cef93afb92b | 36BnPEtTZxp cE5gZ6yjJ7nh T8VFEqr5wg T | 3BCqTnJw4U DfTMFhrwhgj ezTbbJPHNgi do | BTC | 0.7041402 |
| 4/21/2023 <br><br> *[Scammer's wallet to OKX]* | d2db35203e0c57a97 f118f4250aae1b1df2 72f8c684236a84191 307eb4749f6e | 3BCqTnJw4U DfTMFhrwhgj ezTbbJPHNgi do | **36Qg3DfZsJ PdNxwXk8es BodR26tHeK pSR** | BTC | 0.8598781 |
| 4/21/2023 <br><br> *[Scammer's wallet to OKX]* | d2db35203e0c57a97 f118f4250aae1b1df2 72f8c684236a84191 307eb4749f6e | 3BCqTnJw4U DfTMFhrwhgj ezTbbJPHNgi do | **36Qg3DfZsJ PdNxwXk8es BodR26tHeK pSR** | BTC | 0.2899216 |
| 4/21/2023 <br><br> *[Scammer's wallet to OKX]* | ea5783709b9757c20 2605e6ebbc1e6cc8b 90728890cb149d68f 2178fdad59aba | 3BCqTnJw4U DfTMFhrwhgj ezTbbJPHNgi do | **3C7USWmsG d4pnSiHYysU 8RHnWyuRK Ai54W** | BTC | 0.7035402 |
| 4/26/2023 <br><br> *[Watt's crypto exchange account to Scammer's wallet]* | 128d6ed74070897af 097994a4ebd141fba 77a2c1f15e8034d63 ea31439b240ee | 36BnPEtTZxp cE5gZ6yjJ7nh T8VFEqr5wg T | 3BCqTnJw4U DfTMFhrwhgj ezTbbJPHNgi do | BTC | 2.2660199 |

| Date | Transaction ID | Source Address | Destination Address | Coin | Funds under claim (stated in cryptocurrency unit) |
|---|---|---|---|---|---|
| 4/26/2023 *[Scammer's wallet to OKX]* | 643754e93fdddef20 cdc8b14dd86f8be52 3963ca57fcca0ac88 1191e47787a19 | 3BCqTnJw4U DfTMFhrwhgj ezTbbJPHNgi do | **3C7USWmsG d4pnSiHYysU 8RHnWyuRK Ai54W** | BTC | 2.2660199 |
| 4/26/2023 *[Watt's crypto exchange account to Scammer's wallet]* | 64963565d68e8251 11f59551fc8ab165c 7e7db0c72fdcceaca 3d0952e75d8ef3 | 36BnPEtTZxp cE5gZ6yjJ7nh T8VFEqr5wg T | 3BCqTnJw4U DfTMFhrwhgj ezTbbJPHNgi do | BTC | 0.8719901 |
| 4/26/2023 *[Scammer's wallet to OKX]* | 643754e93fdddef20 cdc8b14dd86f8be52 3963ca57fcca0ac88 1191e47787a19 | 3BCqTnJw4U DfTMFhrwhgj ezTbbJPHNgi do | **3C7USWmsG d4pnSiHYysU 8RHnWyuRK Ai54W** | BTC | 0.8719901 |
| 5/8/2023 *[Watt's crypto exchange account to Scammer's wallet]* | 665dac8f69975dd26 2080614547464b7e d9315f186827f6950 84073496afc737 | 36BnPEtTZxp cE5gZ6yjJ7nh T8VFEqr5wg T | 34GQBn3KhU MmxpcsDE6u hZAzbBTeYV bLRY | BTC | 0.1787068 |
| 5/11/2023 *[Watt's crypto exchange account to Scammer's wallet]* | 1d913f53d42eb61c1 0ee5333a7cc96f1d5 ccac6d5457f17cc1c 3d6769a76b836 | 36BnPEtTZxp cE5gZ6yjJ7nh T8VFEqr5wg T | 34GQBn3KhU MmxpcsDE6u hZAzbBTeYV bLRY | BTC | 0.5473373 |
| 5/11/2023 *[Scammer's wallet to OKX]* | 1c07dfba8859c0ce0 d50a229ad05868cc9 e185fff35fa724895f 3f2e1ba8d0ff | 34GQBn3KhU MmxpcsDE6u hZAzbBTeYV bLRY | **3AAJ8CgwoP xecTbWxmz GAqzKE8j79 9QdsQ** | BTC | 0.1787068 |
| 5/12/2023 *[Watt's crypto exchange account to Scammer's wallet]* | 9848fbc7f90c704ad eb8eadd71534df358 94d0a217870a5d33 983d139ab9fe6d | 36BnPEtTZxp cE5gZ6yjJ7nh T8VFEqr5wg T | 33nisH8krWu KLfRFgw3yb EQkABW6L W7GxH | BTC | 3.7348998 |
| 5/12/2023 *[Scammer's wallet to OKX]* | aa9b57a25c980c37e 1dc24f085a07b430e 59e129237e78cb16b 406e4d436fd97 | 33nisH8krWu KLfRFgw3yb EQkABW6L W7GxH | **3AAJ8CgwoP xecTbWxmz GAqzKE8j79 9QdsQ** | BTC | 3.73399675 |
| 5/12/2023 *[Scammer's* | 29ba802cdba34814e2 d052838e931ae9849 e9b6ac2d0608ffe36 | 34GQBn3KhU MmxpcsDE6u hZAzbBTeYV | **3AAJ8CgwoP xecTbWxmz GAqzKE8j79** | BTC | 0.5467373 |

| Date | Transaction ID | Source Address | Destination Address | Coin | Funds under claim (stated in cryptocurrency unit) |
|---|---|---|---|---|---|
| *wallet to OKX]* | 73ad533f7f2ae | bLRY | **9QdsQ** | | |
| 5/18/2023 *[Watt's crypto exchange account to Scammer's wallet]* | 109e160e3c09b0add2dce981fa83fb308ee11df71292e6d954b96315423dce3f | 36BnPEtTZxpcE5gZ6yjJ7nhT8VFEqr5wgT | 33nisH8krWuKLfRFgw3ybEQkABW6LW7GxH | BTC | 0.0729773 |
| 5/19/2023 *[Scammer's wallet to OKX]* | 7e41141402009638348c5d64b11756d61bda33c6d0850d104ca46b4696d552be | 33nisH8krWuKLfRFgw3ybEQkABW6LW7GxH | **3AAJ8CgwoPxecTbWxmzGAqzKE8j799QdsQ** | BTC | 0.0722236 |
| 5/30/2023 *[Watt's crypto exchange account to Scammer's wallet]* | d2d64bf9fc833fb25ae2c1b11b271139b17b0d3ce895809273922b275b4ee0c3 | 36BnPEtTZxpcE5gZ6yjJ7nhT8VFEqr5wgT | 33nisH8krWuKLfRFgw3ybEQkABW6LW7GxH | BTC | 0.2303858 |
| 5/31/2023 *[Scammer's wallet to OKX]* | 32dcef77592b189babd4aa7f5595014f33f85435038398db4d5a257e36103d2e | 33nisH8krWuKLfRFgw3ybEQkABW6LW7GxH | **3AAJ8CgwoPxecTbWxmzGAqzKE8j799QdsQ** | BTC | 0.22969735 |
| 6/7/2023 *[Watt's crypto exchange account to Scammer's wallet]* | c7c55c9f398b03b1fc5c78e2c5e441fcf0bb8b03610cc9901e21f59a85ed7df2 | 36BnPEtTZxpcE5gZ6yjJ7nhT8VFEqr5wgT | 3ADojAjZdTE1ARQoNZ4xiueQah5PXoPv5g | BTC | 0.0734197 |
| 6/12/2023 *[Scammer's wallet to OKX]* | 8a545a7e2679cee558eb52bf1ceaf191dbceb75fd8605c6115bc8b4ce25abd4c | 3ADojAjZdTE1ARQoNZ4xiueQah5PXoPv5g | **3AAJ8CgwoPxecTbWxmzGAqzKE8j799QdsQ** | BTC | 0.0734197 |
| 6/15/2023 *[Watt's crypto exchange account to Scammer's wallet]* | 0cf3ee4cc4d56bbb7044e9fb58a93a892dccf21ddea5be2563b6803b98e5a269 | 36BnPEtTZxpcE5gZ6yjJ7nhT8VFEqr5wgT | 3BrrTzawFa6cAqaRHA6Z8RdaWxt2wHvH1t | BTC | 5.5035119 |

| Date | Transaction ID | Source Address | Destination Address | Coin | Funds under claim (stated in cryptocurrency unit) |
|------|----------------|----------------|---------------------|------|--------------------------------------------------|
| 6/15/2023 *[Scammer's wallet to OKX]* | 611ff021c4b1d05f7dccf219e3138d3349eb6b43b9a610b113c03fef7dd89988 | 3BrrTzawFa6cAqaRHA6Z8RdaWxt2wHvH1t | **3C7USWmsGd4pnSiHYysU8RHnWyuRKAi54W** | BTC | 5.5029119 |
| 6/21/2023 *[Watt's crypto exchange account to Scammer's wallet]* | 22c179413a569b4103a78ae7e8ff6f627186d4d1e63688634a5d58a294aaf391 | 36BnPEtTZxpcE5gZ6yjJ7nhT8VFEqr5wgT | 3BrrTzawFa6cAqaRHA6Z8RdaWxt2wHvH1t | BTC | 2.4690143 |
| 6/21/2023 *[Scammer's wallet to OKX]* | bad99a2021ca9070a577d0c2654732fce129614245211e9c5ff1616e54e30e15 | 3BrrTzawFa6cAqaRHA6Z8RdaWxt2wHvH1t | **3AAJ8CgwoPxecTbWxmzGAqzKE8j799QdsQ** | BTC | 2.46837225 |
| 7/17/2023 *[Watt's crypto exchange account to Scammer's wallet]* | 57f954dc59ab73603a742a57f37d3ed4bbb7d70bbe6eed5c36935ec4cef86157 | 3LDt1mcUkyJ7GBPTWHFzXMXyF6fLA2vszT | 3F3dbSqEmoZ7qGdtscdskQcm5WHoBk8d8b | BTC | 0.01629 |
| 7/18/2023 *[Scammer's wallet to OKX]* | 99ff15c7cc100851bb4285bf7f745caa8278dc7c1a68f132f653aad2a6ef3ece | 3F3dbSqEmoZ7qGdtscdskQcm5WHoBk8d8b | **3C7USWmsGd4pnSiHYysU8RHnWyuRKAi54W** | BTC | 0.01629 |
| 7/18/2023 *[Watt's crypto exchange account to Scammer's wallet]* | 06f363813762ad3b6e4276df5855ba679c15294830bf1fc903bfa46363d866be | 3LDt1mcUkyJ7GBPTWHFzXMXyF6fLA2vszT | 3F3dbSqEmoZ7qGdtscdskQcm5WHoBk8d8b | BTC | 1.85169 |
| 7/18/2023 *[Scammer's wallet to OKX]* | c766e223b833953e481a80890e8bb9ba7ed6310370dba6e757d60de9168c53a5 | 3F3dbSqEmoZ7qGdtscdskQcm5WHoBk8d8b | **3C7USWmsGd4pnSiHYysU8RHnWyuRKAi54W** | BTC | 1.85169 |
| 7/27/2023 *[Watt's crypto exchange account to Scammer's wallet]* | 0e652ec78e491a23456f298beea5bf55200e0bde6aa7742cd49e451bdfd7bf01 | 3LDt1mcUkyJ7GBPTWHFzXMXyF6fLA2vszT | 3F3dbSqEmoZ7qGdtscdskQcm5WHoBk8d8b | BTC | 1.72295 |

| Date | Transaction ID | Source Address | Destination Address | Coin | Funds under claim (stated in cryptocurrency unit) |
|---|---|---|---|---|---|
| 7/31/2023<br><br>*[Scammer's wallet to OKX]* | aedbfd4d12e363e45 f7f50d80726abe5cd daee34f37a061e5d0 87c917920f223 | 3F3dbSqEmoZ 7qGdtscdskQc m5WHoBk8d8 b | **3C7USWmsG d4pnSiHYysU 8RHnWyuRK Ai54W** | BTC | 1.72573724 |
| 8/25/2023<br><br>*[Watt's crypto exchange account to Scammer's wallet]* | 8face08868ff7c57e0 38db03a0b5818f618 73378f1468cec46fd 253dd512a3a4 | 3LDt1mcUkyJ 7GBPTWHFz XMXyF6fLA2 vszT | 3F3dbSqEmoZ 7qGdtscdskQc m5WHoBk8d8 b | BTC | 0.9099 |
| 8/25/2023<br><br>*[Scammer's wallet to OKX]* | 665cd6c23c625ff92 bc692d28340b1d33 d5a48e614ba0668f4 9f387d77b87c6d | 3F3dbSqEmoZ 7qGdtscdskQc m5WHoBk8d8 b | **3C7USWmsG d4pnSiHYysU 8RHnWyuRK Ai54W** | BTC | 0.9099 |
| 2/14/2024<br><br>*[Watt's crypto exchange account to Watt's private wallet]* | 0x3a838d1db2aad8f 75ed5f8077e73df9a be3c2d8be7bf90a1a 8cae794cb43a56e | 0xa7E0236957 dA7E937D8bc 1b1D7c6E56E F7418bB8 | 0xB1E7bAE33 5b167a861446 D83deA78752 C1A2aae0 | ETH | 8.73398 |
| 2/15/2024<br><br>*[Watt's private wallet to Scammer's wallet]* | 0x175f3d582e81f0f e2daa2c5d782883ea 7536fe9188bdf6c5e 0899e4dc341935a | 0xB1E7bAE33 5b167a861446 D83deA78752 C1A2aae0 | 0x1819D8A6F 747cC6708aBf 00d395c3Ea73 fdBA9F0 | ETH | 8.7281<br><br>[These funds were later transferred to<br><br>**0x7589A82F2e8A19b0 E414Ba5215181dE805 1e4e60**<br><br>at OKX.] |
| 3/6/2024<br><br>*[Watt's crypto exchange account to Watt's private wallet]* | 0xd4d0ede9b16fbb7 79d83b52561b3036 b0280ea5ef3735e41 6948354a6d58c39b | 0xa7E0236957 dA7E937D8bc 1b1D7c6E56E F7418bB8 | 0xB1E7bAE33 5b167a861446 D83deA78752 C1A2aae0 | ETH | 2.52591 |
| 3/6/2024<br><br>*[Watt's private wallet to Scammer's wallet]* | 0x40aca2836012fb6 40f5f64e276be1af9e aef38546a5454b784 5b4af38039e4cc | 0xB1E7bAE33 5b167a861446 D83deA78752 C1A2aae0 | 0x103645d89f 2a09d30fE4b0 C60bF1A62F9 86b3fd5 | ETH | 2.5174 |
| 3/13/2024<br><br>*[Watt's crypto exchange* | 0xe9c05dff857c6dd a02db98c5592b343f 980a3c148501fbc30 | 0xa7E0236957 dA7E937D8bc 1b1D7c6E56E | 0xB1E7bAE33 5b167a861446 D83deA78752 | ETH | 4.92249 |

| Date | Transaction ID | Source Address | Destination Address | Coin | Funds under claim (stated in cryptocurrency unit) |
|---|---|---|---|---|---|
| *account to Watt's private wallet]* | 0ce11645f94992e | F7418bB8 | C1A2aae0 | | |
| 3/13/2024 *[Watt's private wallet to Scammer's wallet]* | 0x064bd37e2f4a8a8 1a46c8642511a94cc f8eaafd301dc4e9e7f ddd7bbea685faa | 0xB1E7bAE33 5b167a861446 D83deA78752 C1A2aae0 | 0x103645d89f 2a09d30fE4b0 C60bF1A62F9 86b3fd5 | ETH | 4.9154 |
| 4/11/2024 *[Watt's crypto exchange account to Watt's private wallet]* | 0x141cbd0676e1d1 9518e661e1997498 033837a68c64944f9 4bb6e00b2137ddd0 6 | 0xa7E0236957 dA7E937D8bc 1b1D7c6E56E F7418bB8 | 0xB1E7bAE33 5b167a861446 D83deA78752 C1A2aae0 | ETH | 7.94225 |
| 4/11/2024 *[Watt's private wallet to Scammer's wallet]* | 0xff667d150fc72b7 8eb86edacd93cb27d c2f9d12e9d016d46e 58f445eef08dcc9 | 0xB1E7bAE33 5b167a861446 D83deA78752 C1A2aae0 | 0x895105293F C70437fFa8d9 299Bd40458c C9BDB39 | ETH | 7.9414 |
| 4/12/2024 *[Scammer's wallet to OKX]* | 0x732570025346d9 5484f772d188ef9d9 8535c4d014fd1c120 243a620fda075f8c | 0x895105293F C70437fFa8d9 299Bd40458c C9BDB39 | **0xd49cd43230 860f7A244D5 2FCD78a43C bE068e8Ff** | ETH | 16 |
| 4/25/2024 *[Watt's crypto exchange account to Watt's private wallet]* | 0x9c76b24a754ba00 4ccccfae06924209e c4443b3ea5398854b 3d077f3a8fbfd11 | 0xa7E0236957 dA7E937D8bc 1b1D7c6E56E F7418bB8 | 0xB1E7bAE33 5b167a861446 D83deA78752 C1A2aae0 | ETH | 2.56939 |
| 4/25/2024 *[Watt's private wallet to Scammer's wallet]* | 0xe56707014ea3b73 7b21b358e43f8282f 40f64b0c4b8ec7a69 4abe00dafddeaea5 | 0xB1E7bAE33 5b167a861446 D83deA78752 C1A2aae0 | 0x895105293F C70437fFa8d9 299Bd40458c C9BDB39 | ETH | 2.569 |
| 4/25/2024 *[Scammer's wallet to OKX]* | 0xf1d618c33c0c624 b14a79a4292ae5a9e 7e04a5eda6267ed0d c0ffe7023012955 | 0x895105293F C70437fFa8d9 299Bd40458c C9BDB39 | **0xd49cd43230 860f7A244D5 2FCD78a43C bE068e8Ff** | ETH | 12.9 |

125. The cryptocurrency taken from Plaintiff Supples and the other members of the Class and transferred to OKX followed similar types of paths as those described above. After the cryptocurrency was stolen from Plaintiff Supples and the other members of the Class, it was

traceable on the blockchain so the location of the cryptocurrency could, with the assistance of a forensic expert, be identified and potentially recovered. OKX, however, failed to implement adequate KYC and AML policies and procedures so the bad actors who stole their cryptocurrency were able to launder it through OKX. As a result of the laundering of their stolen cryptocurrency through OKX.com, Plaintiff Supples and the other members of the Class lost the ability to track and potentially recover their stolen cryptocurrency.

126.    As a direct and proximate result of OKX's policies and failures described herein, Plaintiffs and all Class members suffered financial harm when their digital assets were laundered through OKX.

127.    As of the date of this filing, Plaintiffs and the members of the Class have not recovered some, if not all, of their stolen cryptocurrency that was transferred to OKX.

## RICO ALLEGATIONS

128.    Defendants engaged in a fraudulent scheme, common course of conduct, and conspiracy to generate transactions on its exchange and gain market share for OKX by enabling bad actors to launder cryptocurrency from the United States through the OKX Platform.

129.    To achieve these goals, Defendants set up and managed the OKX Platform, including OKX.com and OKCoin.com, in a manner that willfully violated U.S. laws and regulations requiring adequate KYC or AML policies so that bad actors and U.S. sanctioned entities could create accounts, engage in cryptocurrency transactions, and deposit and withdraw cryptocurrency.

130.    As a direct result of their conspiracy and fraudulent scheme, bad actors laundered cryptocurrency through the OKX Platform which was taken from Plaintiffs and the Class as a result of hacks, ransomware, and theft.

**The OKX Crypto-Wash Enterprise**

131.    OKX Group was formed in 2015 and since that time has operated cryptocurrency trading platforms, including the platforms located at OKX.com and OKCoin.com. OKX.com is one of the most active cryptocurrency exchanges in the world.  Star Xu founded OKX Group, OKCoin.com and OKX.com and, prior to and during the Class Period, served as the control person and beneficial owner, made the strategic decisions for OKX Group and the OKX Platform, and exercised day-to-day control over their operations and finances.  Star Xu oversaw OKX's compliance policies and procedures, including KYC and AML policies.  Hao served as CEO of OKX from approximately November 2018 until January 2023, where he oversaw OKX's strategy, operations, growth, and compliance and risk management practices, including with respect to KYC and AML policies and procedures.  Fang serves as the President of OKX, occupying the role since January 2023, and previously served as the CEO of OKCoin from March 2020 to December 2023, where she oversaw global branding and compliance and risk policies, including with respect to KYC and AML policies and procedures.  Star Xu, Hao, and Fang oversaw and directed OKX.com's strategy of willfully disregarding KYC and AML laws and regulations so that customers could use OKX.com anonymously from the United States and from sanctioned jurisdictions.

132.    Defendant OKX Group is made up of numerous different legal entities around the world, including OKCoin USA Inc., Aux Cayes FinTech Co. Ltd., and many others.  OKCoin USA is a subsidiary of OKX Group and serves users in the United States through the OKX Platform, including the OKCoin.com exchange.  OKCoin USA Inc. is a Delaware corporation which operates under the OKX brand and oversees the OKCoin.com website for users in the United States and its territories.  Aux Cayes FinTech Co. Ltd. is a Seychelles registered company for all users of OKX's services who are not specifically covered by one of OKX Group's other subsidiaries.  OKX Group

exercised full control over each of the entities involved in the OKX Crypto-Wash Enterprise, including Aux Cayes and OKCoin USA.

133.    Star Xu, Hao, and Fang, along with a core senior management group, made the strategic decisions for OKX, OKX.com, OKCoin.com, and the OKX Platform, and exercised day-to-day control over their operations and finances.

134.    The OKX Officers and OKX Group, Aux Cayes, OKX US, OKX.com, OKCoin.com, and other OKX Group subsidiaries not named as defendants, constituted an "enterprise" (the "OKX Crypto-Wash Enterprise") within the meaning of 18 U.S.C. §1961(4) since the start of the Class Period, through which the OKX Officers and OKX Group Defendants conducted the pattern of racketeering activity described herein.

135.    Members of the OKX Crypto-Wash Enterprise include but are not limited to Defendants OKX Group, Aux Cayes, and OKX US, certain of OKX's officers and employees, and third-party bad actors that used OKX as a haven to launder money stolen from innocent third parties like Plaintiffs.

136.    Alternatively, OKX US and the OKCoin.com platform were associated-in-fact with OKX Group, Aux Cayes, and OKX.com for a number of common and ongoing purposes, including executing and perpetrating the scheme alleged herein, and constituted an "enterprise" within the meaning of 18 U.S.C. §1961(4), the activities of which affected interstate commerce, because they involved commercial and financial activities across state lines, including through the operation of websites over the Internet and the transmission of cryptocurrency.

137.    Therefore, the OKX Crypto-Wash Enterprise operated the OKX.com and OKCoin.com exchanges since before the start of the Class Period.  Star Xu has directly or indirectly owned OKX Group and the various entities that collectively operate the OKX Platform.  The OKX

Crypto-Wash Enterprise engaged in, and its activities affected, interstate commerce, including through the operation of websites over the Internet and through the transmission of cryptocurrency.

138.    Star Xu has directly or indirectly owned the various entities that collectively operate the OKX Platform, including each of the OKX Defendants.  Star Xu, along with Hao and Fang, made the strategic decisions for OKX Group, Aux Cayes, OKX US, and the OKX Platforms and exercised day-to-day control over their operations and finances.

139.    Star Xu exercised substantial control over the affairs of the OKX Crypto-Wash Enterprise, through, among other methods and means, the following:

(a)    Providing the initial operating capital and holding most of the shares of OKX Group;

(b)    Devising the strategy to maximize transaction volume on the OKX exchange and gain market share by violating the BSA by willfully causing OKX.com to fail to implement and maintain the necessary KYC requirements or an effective AML program;

(c)    Communicating to OKX's employees his overall strategy of not requiring the collection of the necessary KYC information and thereby willfully violating KYC and AML laws; and

(d)    Managing the day-to-day affairs of OKX.com and OKCoin.com with the purpose of ensuring OKX's most valuable customers, including bad actors, could continue using the OKX Platform.

140.    Defendants and the OKX Officers exercised control over and directed the affairs of the OKX Crypto-Wash Enterprise through, among other things, using OKX's core senior management group to direct critical aspects of the OKX Crypto-Wash Enterprise operations.

141.    The OKX Crypto-Wash Enterprise was an ongoing and continuing organization consisting of legal entities, such as a corporation and limited liability company, as well as

individuals associated for the common or shared purpose of ensuring that OKX did not implement adequate KYC or AML policies so that OKX.com could maximize transaction volume on the OKX exchange and increase market share, in violation of the law.

142.    Many OKX customers were not bad actors and used the OKX Platform for legitimate purposes.  However, Defendants and the OKX Officers, through the OKX Crypto-Wash Enterprise, have engaged in a pattern of racketeering activity which also enabled bad actors to use the OKX Platform to launder stolen cryptocurrency so that it could not be tracked or recovered.

143.    The OKX Crypto-Wash Enterprise engages in and affects interstate commerce because it involves commercial and financial activities across state boundaries, such as through the operation of the OKX.com (and OKCoin.com) platforms over the Internet and through the transmission of cryptocurrency into and out of OKX.com, and over OKX.com's exchange.

144.    At all relevant times herein, each participant in the OKX Crypto-Wash Enterprise was aware of the scheme.

145.    Defendants were each knowing and willing participants in the scheme and reaped financial benefits therefrom.

146.    The OKX Crypto-Wash Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engaged.  The OKX Crypto-Wash Enterprise is separate and distinct from each of the Defendants.

**RICO Conspiracy**

147.    Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.

148.    Defendants have engaged in a conspiracy to maximize transaction volume on the OKX exchange and/or market share for OKX, and generate income for Defendants, the key non-

defendants alleged herein, including Star Xu, and their unnamed co-conspirators through the scheme alleged herein.

149.    The objectives of the conspiracy include: (i) executing the scheme; and (ii) enabling customers to use OKX.com without OKX.com requiring adequate KYC or implementing adequate AML policies, including U.S.-based users and users from sanctioned jurisdictions.

150.    To achieve these goals, Defendants willfully disregarded U.S. laws and regulations and encouraged bad actors to launder crypto at OKX.com.  Defendants have also agreed to participate in other illicit and fraudulent practices, all in exchange for agreement to, and participation in, the conspiracy.

151.    Each Defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objectives of the conspiracy and participated in the common course of conduct to enable U.S.-based users of OKX.com, and to enable bad actors to launder crypto stolen from victims in the United States at OKX.com.

152.    Before and during the Class Period, Defendants knew and admitted that OKX's KYC procedures to prevent U.S. users could be easily circumvented.  According to the DOJ SOF, "***OKX did not adequately or consistently use commercially available software to monitor and detect suspicious activity, including money laundering***, and OKX did not have adequate controls to determine whether either party to transactions on the exchange was potentially subject to sanctions imposed by the U.S. Treasury Department."

153.    OKX employees intentionally advised and encouraged U.S. users to evade KYC procedures.  According to the DOJ SOF, "OKX employees advised customers how to provide inaccurate information to circumvent the company's KYC process and official policy prohibiting U.S. customers."  In April 2023, an OKX employee "encouraged a potential U.S. customer to open an account by providing false information about the customer's nationality during the KYC

processing."  The OKX employee wrote to the U.S. customer "***I know you're in the US but you could just put a random country and it should go through***.  You just need to put [n]ame, nationality, and ID number.  You could just put United Arab Emirates and ***random numbers*** for the ID number."  Likewise in January 2024, the "same employee wrote to another potential U.S. customer and asked if the individual had 'any workaround on KYC outside of the US to make it potentially work.'"  The OKX employee's messages illustrate the ease at which U.S. users could circumvent the Platform's KYC procedures.

154.    OKX employees also promoted OKX.com on social media as an exchange that did not require KYC information and implemented a marketing campaign in the United States to attract U.S. users.  OKX employees, including a senior executive, exchanged internal messages on how users can circumvent KYC procedures.  Further, Defendants received numerous reports indicating that substantial numbers of U.S. persons were regularly accessing OKX.com.

155.    Even after OKX began requiring every customer to provide KYC information, OKX employees continued to advise U.S. customers on how to evade the KYC requirement.

156.    As a result of Defendants' illegal scheme and conspiracy, Plaintiffs and the members of the Class had crypto taken from them through hacks, ransomware, or theft and laundered at OKX.com.  But for Defendants' scheme, Plaintiffs and the members of the Class would not have had their stolen cryptocurrency laundered at OKX.com which resulted in their stolen cryptocurrency being no longer traceable on the blockchain.  Therefore, the damages that Defendants caused Plaintiffs and the Class may be measured, at a minimum, by the dollar value of the cryptocurrency taken from Plaintiffs and the Class as the result of illegal conduct, such as hacks, ransomware, or theft, which was laundered through OKX.com.

**Pattern of Racketeering Activity**

157.    Defendants, each of whom is a person associated-in-fact with the OKX Crypto-Wash Enterprise, knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5), and 1962(c).   The racketeering activity was made possible by Defendants' regular and repeated use of the facilities, services, distribution channels, and employees of the OKX Crypto-Wash Enterprise.

158.    Defendants each committed multiple "Racketeering Acts," as described herein and in the DOJ SOF, including aiding and abetting such acts.

159.    The Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission.  Further, the Racketeering Acts were continuous, occurring on a regular, and often daily, basis beginning before the start of the Class Period and continuing until today, and the harm of those Racketeering Acts continue to today.  In fact, Plaintiff Supples' stolen cryptocurrency was laundered through OKX in December 2024.

160.    Defendants participated in the operation and management of the OKX Crypto-Wash Enterprise by directing its affairs, as described above.

161.    In devising and executing the scheme to enable OKX.com to be used by U.S.-based customers and sanctioned users, including bad actors laundering cryptocurrency, Defendants, *inter alia*: (i) committed, and aided and abetted, acts constituting indictable offenses under 18 U.S.C. §1960 (relating to illegal money transmitters) and 18 U.S.C. §1961(1)(E) (act indictable under the Currency and Foreign Transactions Reporting Act aka the Bank Secrecy Act (BSA); and (ii) aided and abetted acts constituting indictable offenses under 18 U.S.C. §1956 (laundering of monetary instruments), 18 U.S.C. §1957 (engaging in monetary transactions in property derived from specified

1   unlawful activity), and 18 U.S.C. §2314 (relating to interstate transportation of stolen property).  For

2   the purpose of executing the scheme to maximize transaction volume on the OKX exchange and

3   market share for OKX.com in violation of KYC and AML rules and regulations, Defendants

4   committed these Racketeering Acts, which number in the millions, intentionally, and knowingly,

5   with the specific intent to advance the illegal scheme.

6       162.    Defendants committed, and aided and abetted, acts constituting indictable offences

7   under 18 U.S.C. §1960 (relating to illegal money transmitters) and the BSA as follows:

8

9           (a)    Defendants and the OKX Officers understood that because OKX.com served a

10  substantial number of U.S. users, it was required to register with FinCEN as a money transmitting

11  business ("MTB") and therefore required under the BSA to implement an effective AML program.

12  Nevertheless, OKX.com did not register with FinCEN as an MTB or implement an effective AML

13  program.  In fact, Defendants willfully violated the BSA by enabling and causing OKX.com to have

14  an ineffective AML program, including a failure to collect or verify KYC information from a large

15  share of its users.

16

17          (b)    Defendants OKX Group and Aux Cayes (and Star Xu and other key non-

18  defendants), aided and abetted by Defendant OKX US, conducted, and conspired to conduct,

19  OKX.com as an unlicensed MTB from before the start of the Class Period to at least the date of this

20  Complaint in violation of 18 U.S.C. §1960(a) and (b)(1)(B), and failed to maintain an effective KYC

21  and AML program, in violation of the BSA, including, 31 U.S.C. §§5318(h) and 5322.

22

23          (c)    Aux Cayes was required to develop, implement, and maintain an effective

24  KYC and AML program that was reasonably designed to prevent OKX.com from being used to

25  facilitate money laundering and the financing of terrorist activities, and Defendant Aux Cayes

26  willfully failed to do so in violation of 31 U.S.C. §5318(h)(1) and 31 C.F.R. §1022.210.

27  Additionally, OKX.com was required to accurately and timely report suspicious transactions to

28

FinCEN; and Defendants OKX Group and Aux Cayes and willfully failed to do so in violation of 31 U.S.C. §5318(g) and 31 C.F.R. §1022.320.

(d)      Defendant OKX US aided and abetted the conduct of OKX.com as an unlicensed MTB in violation of 18 U.S.C. §1960(a), (b)(1)(B), and (b)(2), in that OKX US (and OKCoin.com) was used to distract U.S. regulators from focusing on OKX.com's violations of the law which enabled OKX.com to act as an unlicensed MTB without adequate KYC or AML policies and serve U.S.-based customers, bad actors, and customers from sanctioned jurisdictions.  As alleged above, Defendants OKX Group, Aux Cayes, and key non-defendants, including Star Xu, used OKX US and OKCoin.com to distract regulators to enable OKX.com to continue doing business with U.S.-based customers, bad actors, and customers located in sanctioned jurisdictions, including bad actors who used OKX.com to launder cryptocurrency taken from Plaintiffs and the members of the Class a result of hacks, ransomware, or theft.

163.    These Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission.  For example, during the Class Period numerous U.S. retail users from around the nation conducted deposit and withdrawal transactions on OKX.com.

164.    As a result of Defendants' failure to implement adequate controls requiring KYC and AML policies and block illegal transactions with sanctioned users and bad actors, Defendants willfully enabled bad actors to launder cryptocurrency at OKX.com.

165.    Additionally, Defendants aided and abetted acts constituting indictable offenses under 18 U.S.C. §1956 (laundering of monetary instruments), 18 U.S.C. §1957 (engaging in monetary transactions in property derived from specified unlawful activity), and 18 U.S.C. §2314 (relating to interstate transportation of stolen property) as follows:

(a)     Defendants' scheme of failing to implement adequate KYC and AML procedures for OKX.com turned OKX.com into a hub and magnet for criminals and other bad actors to launder cryptocurrency.  The operation of OKX.com as a means to launder crypto aided and abetted the laundering of the crypto by bad actors.

(b)     Since before the start of the Class Period, OKX.com processed more than $5 billion of suspicious transactions and illicit funds, including transactions by bad actors who took cryptocurrency from Plaintiffs and the members of the Class as a result of hacks, ransomware, or theft and utilized OKX.com to launder the crypto and/or to transfer the crypto through their OKX.com accounts and out of OKX.com in violation of 18 U.S.C. §1956 (laundering of monetary instruments) and 18 U.S.C. §1957 (engaging in monetary transactions in property derived from specified unlawful activity).  Additionally, the illegally obtained cryptocurrency was transported, transmitted, or transferred in interstate or foreign commerce to or from OKX.com in violation of 18 U.S.C. §2314 (relating to interstate transportation of stolen property).  Defendants aided and abetted those actions constituting indictable offenses.

(c)     These Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission.

(d)     Furthermore, even though Aux Cayes has entered into a settlement with the DOJ and agreed to implement KYC and AML procedures, to this day, bad actors continue to attempt to use OKX.com as a means to launder crypto.

166.     Defendants and third parties have exclusive custody or control over the records reflecting the precise dates, amounts, locations, and details of the transactions at OKX.com in commission of the Racketeering Acts in violation of 18 U.S.C. §1960 (relating to illegal money transmitters), 18 U.S.C. §1961(1)(E) (act indictable under the Currency and Foreign Transactions Reporting Act aka the Bank Secrecy Act (BSA), 18 U.S.C. §1956 (laundering of monetary

1    instruments), 18 U.S.C. §1957 (engaging in monetary transactions in property derived from specified

2    unlawful activity), and 18 U.S.C. §2314 (relating to interstate transportation of stolen property).

3                               **CLASS ACTION ALLEGATIONS**

4           167.    Plaintiffs bring this action individually and as a class action pursuant to Federal Rule

5    of Civil Procedure 23 on behalf of the following Class:

6

7           All persons or entities in the United States whose cryptocurrency was removed from
            a non-OKX digital wallet, account, or protocol as a result of a hack, ransomware, or
8           theft and, between January 10, 2021 and the date of Judgment (the "Class Period"),
            was transferred to an OKX.com account, and who have not recovered all of their
9           cryptocurrency that was transferred to OKX.com (the "Class").

10          168.    Excluded from the proposed Class are Defendants and the OKX Officers, and their

11   officers, directors, agents, trustees, parents, corporations, trusts, representatives, employees,

12   principals, partners, joint ventures, and entities controlled by Defendants; their heirs, successors,

13   assigns, or other persons or entities related to, or affiliated with, Defendants; and the Judge(s)

14   assigned to this action; and any member of their immediate families.  Also excluded from the

15   proposed Class are any persons or entities that engaged in the hack, ransomware, or theft that

16   resulted in the removal of the Class members' cryptocurrency or any persons or entities which

17   transferred the crypto to OKX.com.  Further excluded from the proposed Class are any persons or

18   entities who, at the time relevant hereto, held an account with the OKX Platform, including

19   OKX.com or OKCoin.com, and agreed to any terms of use that OKX imposes upon its

20   accountholders.

21          169.    Subject to additional information obtained through further investigation and

22

23   discovery, the foregoing definition of the Class may be expanded or narrowed by amendment,

24   amended complaint, or at class certification proceedings.

25          170.    **Numerosity**: Class members are so numerous that joinder of all individual members

26

27   is impracticable.  While the exact number and identities of the Class members are unknown to

28

Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs allege that the Class is comprised of thousands of individual members geographically disbursed throughout the United States.  The number of Class members and their geographical disbursement renders joinder of all individual members impracticable if not impossible.  Upon information and belief, OKX and third parties, including firms such as Chainalysis, possess lists of wallet addresses which would enable Plaintiffs to identify crypto which has been taken from Plaintiffs and members of the Class as a result of a hack, ransomware, or theft and transferred to OKX.com by bad actors.

171.   **Existence and Predominance of Common Questions**: There are questions of fact and law common to Plaintiffs and the Class members that predominate over any questions affecting solely individual members including, *inter alia*, the following:

(a)   Whether OKX.com knowingly failed to implement or maintain adequate KYC and AML policies;

(b)   Whether OKX encouraged U.S.-based customers to use OKX.com;

(c)   Whether Defendants used OKCoin.com as a distraction for regulators so OKX.com could continue doing business with U.S.-based users;

(d)   Whether Defendants committed civil RICO violations pursuant to 18 U.S.C. §1962(c)-(d);

(e)   Whether Defendants aided and abetted the conversion of cryptocurrency stolen from Plaintiffs and the members of the Class;

(f)   Whether Plaintiffs and the members of the Class have been harmed and the proper measure of relief;

(g)   Whether Defendants' actions proximately caused harm to Plaintiffs and the members of the Class;

(h)     Whether Plaintiffs and the members of the Class are entitled to an award of damages, treble damages, attorneys' fees, and expenses; and

(i)     Whether Plaintiffs and the members of the Class are entitled to equitable relief, and if so, the nature of such relief.

172.    **Typicality**: Plaintiffs' claims are typical of the claims of the members of the proposed Class.  Plaintiffs and the members of the Class have been injured by the same wrongful practices of Defendants.  Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all Class members and are based on the same legal theories.

173.    **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs claims are coextensive with, and not antagonistic to, the claims of other Class members. Plaintiffs are willing and able to vigorously prosecute this action on behalf of the Class, and Plaintiffs have retained competent counsel experienced in litigation of this nature.

174.    **Superiority**: A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants.  It would thus be virtually impossible for Class members, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

175.   Adequate notice can be given to Class members directly using information maintained in Defendants' and/or third-party records or through notice by publication.

## COUNT I

### Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c)-(d) (Against All Defendants)

176.   Plaintiffs re-allege and adopt by reference the allegations above contained in ¶¶1-175, as if fully set forth herein.

177.   This Count I is brought against Defendants OKX Group, Aux Cayes, and OKX US.

178.   Plaintiffs are not relying on any contracts or agreements entered into between OKX, OKX.com, or OKCoin.com and any users of OKX.com or OKCoin.com to assert any claims alleged in this Count I and none of Plaintiffs' claims in this Count I derive from the underlying terms of any such contracts or agreements.

179.   This claim arises under 18 U.S.C. §1962(c) and (d), which provide in relevant part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

180.   At all relevant times, Defendants were "persons" within the meaning of 18 U.S.C. §1961(3), because each Defendant was an individual or "capable of holding a legal or beneficial interest in property." Defendants were associated with an illegal enterprise, as described below, and conducted and participated in that enterprise's affairs though a pattern of racketeering activity, as defined by 18 U.S.C. §1961(5), consisting of numerous and repeated uses of the interstate wire communications to execute a scheme to operate OKX.com in violation of the law in violation of 18 U.S.C. §1962(c).

181.    The OKX Crypto-Wash Enterprise was created and/or used as a tool to carry out the elements of Defendants' illicit scheme and pattern of racketeering activity.  The OKX Crypto-Wash Enterprise has ascertainable structures and purposes beyond the scope and commission of Defendants' predicate acts and conspiracy to commit such acts.  The enterprise is separate and distinct from Defendants.

182.    The members of the RICO enterprise all had the common purpose to maximize transaction volume on the OKX exchange and market share by running OKX.com as a crypto exchange with virtually non-existent KYC or AML policies to serve U.S.-based customers, bad actors, and customers from sanctioned jurisdictions, including bad actors who engaged in the laundering of cryptocurrency obtained as the result of hacks, ransomware, and theft.

183.    The OKX Crypto-Wash Enterprise has engaged in, and its activities affected, interstate and foreign commerce by operating two websites on the Internet (OKX.com and OKCoin.com) which served customers located throughout the United States, received and sent cryptocurrency throughout the United States and the world, and operated cryptocurrency exchanges facilitating the exchange of cryptocurrency between users in the United States and around the world.

184.    The OKX Crypto-Wash Enterprise affected interstate commerce because Plaintiffs and the members of the Class were located in the United States and had their cryptocurrency, which was located in the United States, stolen and then laundered at OKX.com on servers which were located in the United States.

185.    The OKX Crypto-Wash Enterprise actively disguised the nature of Defendants' wrongdoing and concealed or misrepresented Defendants' participation in the conduct of the OKX Crypto-Wash Enterprise to maximize transaction volume on the OKX exchange and market share while minimizing their exposure to criminal and civil penalties.

186.    Each of the Defendants exerted substantial control over the OKX Crypto-Wash Enterprise, and participated in the operation and managed the affairs of the enterprise as described herein.

187.    Defendants have committed or aided and abetted the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§1960, 1961(1)(E), 1956, 1957, and 2314, within the past ten years.  The multiple acts of racketeering activity which Defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, began before the start of the Class Period and are continuing and therefore constitute a "pattern of racketeering activity."

188.    Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. §1961(1) include, but are not limited to:

(a)    **Operating an Unlicensed MTB and Violating the BSA**: Defendants OKX Group and Aux Cayes, aided and abetted by Defendant OKX US, conducted, and conspired to conduct, OKX.com as an unlicensed MTB since before the start of the Class Period in violation of 18 U.S.C. §1960(a) and (b)(1)(B), and failed to maintain an effective KYC and AML program, in violation of the BSA, including, 31 U.S.C. §§5318(h) and 5322.  Defendants willfully violated the BSA by causing OKX.com to have an ineffective AML program, including a failure to collect or verify KYC information from a large portion of its users.

(b)    Defendant OKX US aided and abetted the conducting of OKX.com as an unlicensed MTB in violation of 18 U.S.C. §1960(a), (b)(1)(B), and (b)(2), in that OKX US (and OKCoin.com) was used to distract U.S. regulators from focusing on OKX.com's violations of the law which enabled OKX.com to act as an unlicensed MTB without adequate KYC or AML policies and serve U.S.-based customers, bad actors and customers from sanctioned jurisdictions.

Defendants' failure to implement KYC or AML policies and targeting of U.S.-based users turned OKX.com into a magnet and hub for illicit cryptocurrency transactions.

189.    **Monetary Laundering and Transportation of Stolen Property**: OKX.com processed a substantial number of transactions by bad actors who took cryptocurrency from Plaintiffs and the Class through hacks, ransomware, theft, and/or deceptive conduct and utilized OKX.com to remove the ability to track the crypto and/or to transfer the crypto through their OKX.com accounts and/or out of OKX.com in violation of 18 U.S.C. §1956 (laundering of monetary instruments) and 18 U.S.C. §1957 (engaging in monetary transactions in property derived from specified unlawful activity).  Additionally, the illegally obtained cryptocurrency was transported, transmitted, or transferred in interstate or foreign commerce to or from OKX.com in violation of 18 U.S.C. §2314 (relating to interstate transportation of stolen property).  Defendants aided and abetted those violations as alleged above.

190.    Many of the precise dates and details of the use of OKX.com to launder and transfer cryptocurrency cannot be alleged without access to Defendants' books and records.  Indeed, the success of Defendants' scheme depended upon secrecy, and Defendants have withheld details of the scheme from Plaintiffs and the members of the Class.  Generally, however, Plaintiffs have described occasions on which the predicate acts alleged herein would have occurred.  They include the transfer of millions of dollars in cryptocurrency over several years.

191.    Defendants have obtained money and property belonging to Plaintiffs and the Class as a result of these statutory violations.  Plaintiffs and Class members have been injured in their business or property by Defendants' overt acts, and by their aiding and abetting the acts of others.

192.    In violation of 18 U.S.C. §1962(d), Defendants conspired to violate 18 U.S.C. §1962(c), as alleged herein.  Various other persons, firms, and corporations not named as defendants in this Complaint, including the OKX Officers and OKCoin Europe Ltd., have participated as co-

conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy.

193.    Each Defendant aided and abetted violations of the above laws, thereby rendering them indictable as a principal in the 18 U.S.C. §§1960, 1961(1)(E), 1956, 1957, and 2314 offenses pursuant to 18 U.S.C. §2.

194.    Plaintiffs and the Class have been injured in their property by reason of Defendants' violations of 18 U.S.C. §1962(c) and (d), including the value of their cryptocurrency taken by bad actors which was transferred to OKX.com.  In the absence of Defendants' violations of 18 U.S.C. §1962(c) and (d), Plaintiffs and the Class would not have had their stolen crypto laundered through OKX.com.

195.    Plaintiffs' and the members of the Class's injuries were directly and proximately caused by Defendants' racketeering activity.

196.    Defendants willfully violated the laws requiring KYC and AML policies and knew that bad actors were transferring crypto to and from OKX.com and exchanging that crypto on OKX.com's exchange, and that, as a result, the crypto would no longer be trackable on the public blockchain.  Defendants' violations of the laws requiring KYC and AML policies enabled bad actors to successfully complete and profit from the theft of crypto belonging to Plaintiffs and the members of the Class.  Had Defendants complied with their obligations under the law, the bad actors would not have been able to launder the cryptocurrency stolen from Plaintiffs and the members of the Class at OKX.

197.    Under the provisions of 18 U.S.C. §1964(c), Plaintiffs are entitled to bring this action and to recover treble damages, the costs of bringing this suit, and reasonable attorneys' fees. Defendants are accordingly liable to Plaintiffs and the members of the Class for three times their actual damages as proven at trial plus interest and attorneys' fees.

**COUNT II**

**Conversion**
**(Against Defendants OKX Group and Aux Cayes)**

198.    Plaintiffs re-allege and adopt by reference the allegations above contained in ¶¶1-127 and 167-175, as if fully set forth herein.

199.    This Count II is brought against Defendants OKX Group and Aux Cayes (the "Count II Defendants").

200.    Plaintiffs are not relying on any contracts or agreements entered into between OKX, OKX.com, or OKCoin.com and any users of OKX.com or OKCoin.com to assert any claims alleged in this Count II and none of Plaintiffs' claims in this Count II derive from the underlying terms of any such contracts or agreements.

201.    At the time their cryptocurrency was taken by bad actors by hacks, ransomware, or theft, Plaintiffs owned and had the right to immediately possess the cryptocurrency in their respective private cryptocurrency wallets, protocols, and/or accounts at cryptocurrency exchanges other than OKX.com or OKCoin.com, not just a mere right to payment for the value of that cryptocurrency.

202.    Class members also owned and had the right to immediately possess their stolen cryptocurrency that was later deposited into OKX.com addresses.

203.    As can be done with Plaintiffs' specific, identifiable cryptocurrency, Class members' cryptocurrency assets at issue are specific, identifiable property and can be traced to and from OKX.com accounts.

204.    At all relevant times, the Count II Defendants had actual or constructive knowledge that cryptocurrency stolen from Plaintiffs and the members of the Class had been transferred to accounts on OKX.com's exchange.

205.    Notwithstanding the knowledge of the custody of stolen assets in an OKX.com account, OKX Group, Aux Cayes, and OKC.com wrongfully exercised dominion over Plaintiffs' and Class members' cryptocurrency, thereby converting Plaintiffs' and the Class members' cryptocurrency.

206.    The Count II Defendants knowingly maintained inadequate KYC and AML policies at OKX.com which enabled cryptocurrency hackers and thieves to launder cryptocurrency through the OKX.com ecosystem without providing valid or sufficient personal identification and proof of lawful possession of the cryptocurrency.

207.    The Count II Defendants knew OKX.com KYC and AML policies and procedures, including any tracing analysis of where funds originated, were nonexistent or inadequate. Nevertheless, those inadequacies were ignored, and no effort was taken to utilize reasonable measures to remedy those dangerous shortcomings.

208.    Furthermore, the Count II Defendants knew that cryptocurrency was transferred to OKX.com from previously identified illicit wallets, or refused to determine whether cryptocurrency was transferred to OKX.com from previously identified illicit wallets, even though that information was either already in the Count II Defendants' possession or readily available, and nevertheless wrongfully exercised dominion over that cryptocurrency.

209.    As a result of the knowingly inadequate KYC and AML policies, the Count II Defendants were able to, *inter alia*, wrongfully exercise dominion or retain possession of stolen cryptocurrency.

210.    Plaintiffs and the members of the Class are entitled to the value of their stolen cryptocurrency placed in OKX.com addresses and an amount of damages to be proven at trial, plus interest.

1

2

3

## COUNT III

### Aiding and Abetting Conversion
### (Against All Defendants)

4   211.    Plaintiffs re-allege and adopt by reference the allegations above contained in ¶¶1-127

5   and 167-175 as if fully set forth herein.

6   212.    This Count III is brought against Defendants OKX Group, Aux Cayes, and OKX US.

7   213.    Plaintiffs are not relying on any contracts or agreements entered into between OKX

8   Group, OKX.com, or OKCoin.com and any users of OKX.com or OKCoin.com to assert any claims

9   alleged in this Count III and none of Plaintiffs' claims in this Count III derive from the underlying

10  terms of any such contracts or agreements.

11

12  214.    At the time their cryptocurrency was taken by bad actors by hacks, ransomware, or

13  theft, Plaintiffs owned and had the right to immediately possess the cryptocurrency in their

14  respective private cryptocurrency wallets, protocols, and/or accounts at cryptocurrency exchanges

15  other than OKX.com, not just a mere right to payment for the value of that cryptocurrency.

16

17  215.    As can be done with Plaintiffs' specific, identifiable cryptocurrency, the Class

18  members' cryptocurrency assets at issue are specific, identifiable property and can be traced to and

19  from OKX.com accounts.

20  216.    At all relevant times, Defendants had actual knowledge that cryptocurrency taken

21  from Plaintiffs and the members of the Class had been transferred to accounts on OKX.com's

22  exchange.  Furthermore, Defendants knew that the cryptocurrency was taken from Plaintiffs and the

23  members of the Class because the cryptocurrency was transferred to OKX.com from previously

24  identified illicit wallets, or Defendants refused to determine whether the cryptocurrency was

25  transferred to OKX.com from previously identified illicit wallets as required by law even though that

26  information was either already in OKX's possession or readily available.

27

28

217.    Notwithstanding Defendants' actual knowledge of the custody of stolen assets in a OKX.com address, bad actors absconded with, and converted for their own benefit, Plaintiffs' and the other Class members' property.  Defendants substantially assisted and enabled bad actors to complete the conversion of the cryptocurrency assets.

218.    Defendants rendered knowing and substantial assistance to cryptocurrency bad actors and thieves in their commission of conversion through which they obtained Plaintiffs' and other Class members' cryptocurrency, such that they culpably participated in the conversion.

219.    Defendants ignored the law and knowingly maintained inadequate KYC and AML policies which enabled cryptocurrency hackers and thieves to launder cryptocurrency through the OKX ecosystem without providing valid or sufficient personal identification and proof of lawful possession of the cryptocurrency.

220.    Defendants knew that the OKX.com KYC and AML policies and procedures, including any tracing analysis of where funds originated, were nonexistent or inadequate. Nevertheless, they ignored those inadequacies and made no effort to utilize reasonable measures to remedy those dangerous shortcomings.  This amounts to "driving the getaway car" for the cryptocurrency thieves with full awareness of the harm being committed.

221.    In effect, Defendants were consciously participating in the conversion of Plaintiffs' and Class members' cryptocurrency such that their assistance in the conversion was pervasive, systemic, and culpable.

222.    Defendants knew that OKX US (and OKCoin.com) was being used as a distraction for regulators so that OKX.com could continue serving U.S.-based customers, bad actors, and users from sanctioned jurisdictions, and that OKX.com had become a magnet and hub for bad actors to launder cryptocurrency.

223.    Plaintiffs and the members of the Class are entitled to the value of their stolen cryptocurrency placed in OKX.com addresses and an amount of damages to be proven at trial, plus interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully pray for relief as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the Class representatives and their counsel as Class counsel;

B.    Declaring that Defendants committed civil RICO violations pursuant to 18 U.S.C. §1962(c)-(d);

C.    Declaring that Defendants' actions, as set forth above, converted Plaintiffs' and the members of the Class's cryptocurrency, or alternatively, aided and abetted conversion of that cryptocurrency, where they knowingly failed to follow KYC or AML policies;

D.    Awarding Plaintiffs and the members of the Class actual, compensatory, and treble damages as allowed by applicable law;

E.    Enjoining Defendants from continuing to commit the violations alleged herein, freezing all cryptocurrency in Defendants' possession which belong to Plaintiffs and the members of the Class, ordering the return of cryptocurrency taken from Plaintiffs and the members of the Class, and ordering other necessary injunctive relief;

F.    Awarding pre-judgment and post-judgment interest at the highest rate allowed by law;

G.    Awarding costs, including experts' fees, and attorneys' fees and expenses, and the costs of prosecuting this action; and

H.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues so triable.

1   DATED:  April 3, 2025

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
ERIC I. NIEHAUS

*/s/ Eric I. Niehaus*
ERIC I. NIEHAUS

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
ericn@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN (admitted *pro hac vice*)
EVAN J. KAUFMAN (admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com

SILVER MILLER
DAVID C. SILVER
(*pro hac vice* forthcoming)
JASON S. MILLER
(*pro hac vice* forthcoming)
4450 NW 126th Avenue, Suite 101
Coral Springs, FL  33065
Telephone: 954/516-6000
dsilver@silvermillerlaw.com
jmiller@silvermillerlaw.com

Attorneys for Plaintiffs